19 F.3d 1432
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Robert S. DeMARCO, Plaintiff-Appellee,
v.
OHIO DECORATIVE PRODUCTS, INC., an Ohio corporation;
Edgerton Metal Products, Inc., an Ohio
corporation; Ken-Dec, Inc., a Kentucky
corporation, Defendants-Appellants.
 No. 92-2294.
 United States Court of Appeals, Sixth Circuit.
 Feb. 25, 1994.
 
 Before: GUY and SILER, Circuit Judges; and ENGEL, Senior Circuit Judge.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 In this diversity action, plaintiff, a former sales representative for defendants, alleged that he had orally agreed to a "life-of-the-part" contract term with defendants entitling him to post-termination commissions on sales he had procured prior to his termination. Defendants' failure to honor their commitment to pay these commissions, in part, precipitated this suit. A jury found in favor of plaintiff and awarded him approximately $850,000 on his breach of contract claim. Defendants raise myriad arguments on appeal. For example, defendants argue that plaintiff lacks standing to assert his claims, or alternatively, that this court should judicially estop plaintiff from pursuing his claims. Moreover, defendants contend that the contract entered into by and between plaintiff and defendants fails for indefiniteness. Finally, defendants assert that the district court erred by: (1) admitting evidence in contravention of the best evidence rule; (2) denying their motions for a new trial and for judgment as a matter of law; and (3) overstating the amount of interest owed on the judgment. Finding these arguments without merit, we affirm.
 
 I.
 
 2
 Ohio Decorative Products, Inc. ("Ohio Dec"), along with its subsidiaries Edgerton Metal Products, Inc., and Ken-Dec, Inc., form the Ohio Dec Metal Group ("the Group"). In 1965, Ohio Dec and Edgerton[1] were primarily engaged in the business of manufacturing specialized metal die cast products for the appliance industry. In the fall of 1965, Robert DeMarco began negotiations with Ohio Dec concerning possible employment with the company.
 
 
 3
 DeMarco's first contact with Ohio Dec actually came in 1964. At the time, Ohio Dec was performing a trial run on a die for Chevrolet Bay City, and DeMarco was an industrial engineer at General Motors, a position he had held for the previous ten years. During this trial run, DeMarco worked with Charles Neumann, Ohio Dec's chief engineer. After DeMarco approached Neumann about a sales representative position, Neumann introduced DeMarco to Charles Moeller, Ohio Dec's president. Although DeMarco had no experience as a manufacturer's representative, DeMarco felt that he could help expand the Group's business into an area it had yet to exploit: the automotive industry.
 
 
 4
 Concerned about the risk he was facing in leaving a secure position at GM, DeMarco sought advice from several unidentified GM sales representatives before negotiating the specific terms of his prospective employment. DeMarco claims these representatives suggested that he protect himself by obtaining a "life-of-the-part" commissioning agreement. Such an agreement earns a sales representative commissions on sales of every part for which he obtains the first purchase order. Thus, until the parts in question become obsolete, a life-of-the-part agreement entitles a representative not only to commissions generated during his tenure, but also to commissions made after the representative's employment has been terminated.
 
 
 5
 In September of 1965, Moeller and DeMarco met at Ohio Dec's corporate offices in Spencerville, Ohio, to discuss the terms of DeMarco's employment. Subject to the execution of a mutually satisfactory written contract, the parties agreed on a five-year fixed term during which DeMarco would be Ohio Dec's and Edgerton's exclusive representative to the automotive industry. The parties further agreed that DeMarco would receive a five percent commission for the first three years under the agreement and a four percent commission for the remaining two years.
 
 
 6
 Finally, DeMarco and Moeller discussed "post-termination" commissions. Here, however, the parties seem to have misunderstood each other. DeMarco claims that the parties agreed "that DeMarco would receive commissions on the parts placed with the Metal Group as long as the Group made the part." DeMarco evidently took this to mean that they had settled on a "life-of-the-part" agreement. Moeller, on the other hand, disputes that such an arrangement was reached. He notes that the term "life-of-the-part" was never used during their negotiations and that they never discussed the payment of commissions beyond the first year after termination.
 
 
 7
 After the meeting, DeMarco, according to his testimony, met with a Flint, Michigan, attorney whom he had hired to draft the contract.[2] Upon reviewing the contract and finding it to his liking, DeMarco returned to Ohio Dec's corporate offices, where both he and Moeller executed triplicate originals. DeMarco retained one copy, left another with Moeller, and hand-delivered the third to his attorney in Flint.
 
 
 8
 For the first five years, DeMarco's and the Group's relationship was mutually profitable. In fact, the parties were so pleased with what had transpired that they decided to extend the relationship after the 1965 contract expired by its own terms in 1970. This time, however, there was no written contract; instead, the parties orally agreed "to abide [indefinitely] by the complete contract as initially created in 1965." DeMarco maintains that the issue of post-termination commissions arose again at this juncture and that the parties "agreed that DeMarco would receive commissions on any parts placed with the Metal Group as long as the Group made the part." DeMarco and Moeller never again discussed the terms of the agreement. DeMarco would continue to represent the Group pursuant to the 1970 oral agreement until his eventual termination in December 1987.
 
 
 9
 In 1972, DeMarco's commission rate was reduced from four percent to three percent. Around this time, DeMarco undertook the representation of the recently-formed Ken-Dec. DeMarco and Moeller never discussed whether their 1970 agreement extended to orders manufactured by Ken-Dec or whether Ken-Dec would pay post-termination commissions to DeMarco. Apparently, that Ken-Dec had become part of the "same deal" between DeMarco and the Group was simply assumed.
 
 
 10
 DeMarco's personal and business life, along with his relationship with the Group, began to sour in the early 1980s. In 1981, he instituted a divorce proceeding against his wife. As part of this suit, the court required DeMarco to fully disclose all personal and business assets, including any deferred compensation plans. Although he understood that his wife would rely on these disclosures in entering into a property settlement and child support agreement, DeMarco, the Group observes, did not disclose that he had secured a contractual right to post-termination commissions.
 
 
 11
 Conditions got worse for DeMarco in March of 1983 when he filed a personal bankruptcy petition for Chapter 7 relief. DeMarco's petition claimed liabilities of $1,265,296 and property worth $1,750. Again, the Group notes, DeMarco did not disclose any entitlement to post-termination commissions even though the petition required disclosure of "anything of value," including contingent and unliquidated claims, and future interests.
 
 
 12
 In 1984, fresh from his bankruptcy and still soliciting sales on behalf of Ohio Dec, DeMarco started a business of his own--a tool shop. This endeavor, too, would encounter difficulty, when DeMarco failed to provide timely delivery of tooling to Ohio Dec customers with whom he had contracted. These customers became irate and threatened Ohio Dec with termination of their business relationships. Their threats prompted a meeting in early 1985, during which DeMarco, Moeller, and Dave Myers, Ohio Dec's attorney, assessed DeMarco's performance and his future as a company sales representative. Despite DeMarco's assurances that he would "recommit himself to servicing Ohio Dec and its customers, DeMarco failed to discharge his responsibilities to Moeller's satisfaction." DeMarco eventually was fired on December 1, 1987.
 
 
 13
 Ohio Dec notes that DeMarco had many opportunities to communicate a claim to post-termination commissions in the immediate aftermath of his termination. DeMarco was in frequent contact with Ohio Dec employees during December 1987 and January 1988. He even wrote a letter to Moeller requesting remittance of his November 1987 commission check. DeMarco also discussed his termination with Dick Moeller, a close friend and an Ohio Dec shareholder, and with Tom Casey, a lawyer DeMarco had sought out for legal advice. A letter DeMarco sent to Casey relayed only a "litany of 'gripes' " against Ohio Dec, as well as Demarco's understanding that the 1965 contract specified a five percent commission for five years. Not once during any of these occasions, Ohio Dec asserts, did "DeMarco ... so much as intimate[ ], let alone state[ ], that he believed he was entitled to commissions on subsequent part sales and shipments as he would later claim."
 
 
 14
 DeMarco initiated the instant action in state court. Defendants, Ohio Dec, Edgerton, and Ken-Dec, then removed the case to federal court. DeMarco's original complaint, filed on July 19, 1989, set forth the essential terms of his 1965 contract with defendants. Contrary to what he had written in his letter to Casey, DeMarco claimed in his complaint that defendants had retained his services for a commission of three percent "against the gross sales amount of any products shipped by the Defendants pursuant to blanket purchase orders issued to the Defendants by customers solicited by the Plaintiff." (App. at 41.) The complaint also stated: "Defendants further agreed that in the event the Plaintiff procured a new customer for the Defendants, that he would receive the agreed commission against all orders placed by said new customer accounts so long as he was properly providing the services of a manufacturer's representative for said accounts." (Id.; emphasis added.) According to DeMarco:
 
 
 15
 Defendants breached the aforesaid contract with the Plaintiff by terminating the Plaintiff in December of 1987 without any just cause relating to his performance; Defendants further breached the above mentioned agreement by failing to pay to him the agreed commissions under shipments made in connection with blanket purchase orders issued to the Defendants by customers solicited by the Plaintiff prior to termination.
 
 
 16
 (Id. at 41-42.)
 
 
 17
 On February 26, 1990, DeMarco filed an amended complaint in which he alleged that the 1965 contract provided for a "five percent (5%) commission, then a four percent (4%), and then a three percent (3%) commission against all business obtained by the Plaintiff for the Defendants." (App. at 47.) DeMarco also sought recovery of a debt related to tooling work he had done for defendants. The amended complaint stated further:
 
 
 18
 Business was understood to mean the initial blanket purchase order and all renewals, continuations, extensions, amendments and issuances of new purchase orders so long as the parts described were made from the same basic tooling. It was further agreed and understood that the Plaintiff would be entitled to these continuing commissions even if his services were terminated. His services were terminated without cause in December 1987 and Defendants have refused to pay the agreed commissions for shipments occurring after December 1987 on business procured by the Plaintiff.
 
 
 19
 (Id. at 47-48; emphasis added).
 
 
 20
 A jury trial began on July 6, 1992. The 1965 contract was not offered as evidence because, for various reasons, none of the three originals was available: Moeller's was destroyed in a 1983 fire; DeMarco could not locate his;[3] and the Flint attorney DeMarco believes he retained to draft the contract did not keep records dating back to 1965. Without a contract to review, the jury relied on testimony regarding the contract's provisions. Moeller and Myers, Ohio Dec's corporate counsel, recalled that DeMarco's contract contained a standard post-termination commission clause under which DeMarco and two other representatives were entitled to a one percent commission for one year following termination.
 
 
 21
 Defendants moved for judgment as a matter of law at the close of DeMarco's case and at the close of their own case. The court, however, deferred its decision on both motions pending the jury's verdict. On July 30, 1992, the jury returned a verdict in favor of DeMarco in the amount of $858,825 for commissions and $17,920.84 for tooling work. The jury declined to award damages for commissions on sales that DeMarco projected would occur after trial. The court entered judgment on the verdict for DeMarco in the cumulative amount of $876,745.84.
 
 
 22
 Several post-trial motions followed. Both parties moved to amend the judgment pursuant to Federal Rule of Civil Procedure 60(a): DeMarco to include pre-judgment interest under Michigan and post-judgment interest under federal law; defendants to allocate liability as to each defendant individually and severally. Defendants also filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, or alternatively, for a new trial pursuant to Federal Rule of Civil Procedure 59. The district court denied defendants' motions, but granted DeMarco's motion to amend the judgment to include pre- and post-judgment interest. The amended judgment provided for a total award of $1,140,494.70.
 
 
 23
 Defendants appeal only the jury's award of commissions and the court's award of pre-judgment interest; they do not appeal the less substantial award for DeMarco's tooling work.
 
 II.
 A.
 
 24
 On appeal, defendants first argue that DeMarco lacks standing to assert a claim for life-of-the-part commissions because he failed to disclose his right to such commissions when he filed for bankruptcy in 1983. As this court has previously stated:
 
 
 25
 Standing is a threshold inquiry which we must consider prior to reaching the merits of an appeal. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Article III of the Constitution confines our jurisdiction to the decision of "cases" or "controversies." Standing is one aspect of that limitation requiring a party to have an actual injury or claim. The appropriate inquiry has been framed as follows: "[T]he standing question is whether a plaintiff has 'alleged such a personal stake in the outcome of the controvery' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."
 
 
 26
 T.H.E. Ins. Co. v. Naghtin, 916 F.2d 1082, 1084 (6th Cir.1990) (citations omitted; emphasis added).
 
 
 27
 Defendants claim that if anybody has a stake in the outcome of the instant action, it is DeMarco's trustee in bankruptcy, not Demarco himself. As defendants note, under 11 U.S.C. Sec. 541(a)(1), the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case, and ... the 'interests of the debtor in property' include 'causes of action.' " Bauer v. Commerce Union Bank, 859 F.2d 438, 440-41 (6th Cir.1988), cert. denied, 489 U.S. 1079 (1989). The trustee in bankruptcy acts as the representative of the estate, and accordingly, only the trustee has the "capacity to sue and be sued." 11 U.S.C. Sec. 323(b); see also Vreugdenhil v. Hoekstra, 773 F.2d 213, 214 (8th Cir.1985) (Choses in action owned by the debtor at filing of bankruptcy petition are property of the estate.); Folz v. BancOhio Nat'l Bank, 88 B.R. 149 (Bankr.S.D.Ohio 1987) (at the filing of a petition in bankruptcy, all of a debtor's property becomes property of the estate and debtor's causes of action constitute property rights which are vested solely in the trustee in bankruptcy and subject to his control).
 
 
 28
 Here, defendants maintain, DeMarco's right to life-of-the-part commissions vested in the trustee by operation of law upon DeMarco's filing of a Chapter 7 bankruptcy petition. That DeMarco did not disclose this right does not affect the fact that a transfer of the right occurred. Only if a trustee formally abandons a claim does that claim revest in the debtor, enabling the debtor to then bring suit. Management Investors v. United Mine Workers of America, 610 F.2d 384, 392 (6th Cir.1979). No abandonment took place with regard to DeMarco's bankruptcy, and therefore, defendants argue, DeMarco lacks standing to assert a claim to the commissions in question. See Stein v. United Artists Corp., 691 F.2d 885, 891 (9th Cir.1982) ("When the bankrupt fails to list an asset, he cannot claim abandonment because the trustee has had no opportunity to pursue the claim."); Rowland v. Mutual Life Ins. Co. of New York, 689 F.Supp. 793, 797 (S.D.Ohio 1988) ("[A]bandonment presupposes knowledge. As a general rule, there can be no abandonment by mere operation of law of property that was not listed in the debtor's schedule or otherwise disclosed to the creditors."); In re Auto West, Inc., 43 B.R. 761, 764 (Bankr.D.Utah 1984) ("[C]ourts that have considered how unlisted assets are to be pursued after confirmation of a reorganization plan have concluded that when a bankrupt fails to list an asset there can be no abandonment.").
 
 
 29
 Two cases in particular inform our analysis of this issue. First, in Ryerson v. Rau, 739 F.2d 1423 (9th Cir.1984), prior to filing a petition in bankruptcy, a Chapter 7 debtor and his employer, an insurance company, entered into an "Appointment Agreement." This agreement not only provided that the debtor would serve as a district manager, but also that, in the event of cancellation or other termination of the debtor's appointment, the company could at its option pay "contract value" to the debtor. " 'Contract value' was defined as the service commission overwrite paid to the District Manager during the six months immediately preceding termination times a factor determined by the number of years of service as District Manager." Id. at 1424. The company added three conditions to the debtor's receipt of contract value: (1) no monies would be forthcoming until the debtor served one full year in his position; (2) the debtor had to be in good standing with the company as of the date of termination; and (3) the debtor must not have been guilty of certain specified forms of misconduct. Termination was to occur on the death of the debtor or upon cancellation of the agreement by either party.
 
 
 30
 Approximately four years after the debtor had entered into the agreement, the debtor, who was still with the company, filed his bankruptcy petition. Nine months after the filing, however, the agreement was cancelled. The contract value on the date of termination was determined to be $18,588. The debtor sought a declaratory judgment that the contract value monies were not property of the estate. A bankruptcy appellate panel ruled against the debtor, and an appeal followed.
 
 
 31
 The Ryerson court affirmed the panel's decision, while taking special note of the intent of Congress on the matter: "By including all legal interests without exception, Congress indicated its intention to include all legally recognizable interests [as part of the bankruptcy estate] although they may be contingent and not subject to possession until some future time." Id. at 1425. The court determined that, as of the date the debtor filed his petition, the debtor's right to the contract value was not "truly contingent" in that "the termination or cancellation of the appointment [was] an event certain to occur." Id. at 1425 n. 1 (emphasis added). The debtor's right, the court observed, was only contingent in the sense that, at the time the debtor filed his petition, an actual date of payment could not be determined with precision; the fact that payment would ultimately occur, however, could not be disputed. The court concluded:
 
 
 32
 Having concluded that [the debtor's] right to "contract value" is property of the bankruptcy estate, we have no difficulty concluding that any payments paid upon termination of [the debtor's] appointment are also property of the bankruptcy estate although paid after commencement of the case, at least to the extent the payments are related to prebankruptcy services.
 
 
 33
 (Id. at 1425.)
 
 
 34
 The second case of particular significance to the instant action, In re Bruneau, 148 B.R. 4 (Bankr.D.Conn.1992), also involves a dispute over proceeds from a termination agreement between an employee and an employer. In Bruneau, the debtor and her husband filed a joint Chapter 7 petition on November 6, 1991. At the time, the debtor was an employee of an insurance company. On September 30, 1991, this company had offered its employees a one-time option, exercisable on or before November 15, 1991, to terminate their employment on November 22, 1991, in exchange for payments totaling one year of base salary. Under its buy-out plan, the company reserved the right to reject an individual election based upon its needs. One week after filing her Chapter 7 petition, the debtor notified the company of her election to terminate her employment. Her termination entitled her to $20,000, which she chose to receive over a fifty-two week period. The debtor's Chapter 7 trustee, however, had other ideas. On April 23, 1992, the trustee filed a complaint in which he asserted the estate's right to the debtor's termination proceeds. Relying on Ryerson, the trustee argued that while the debtor's election to participate in the company's plan occurred post-petition, the debtor's right to participate not only existed pre-petition, but was based on the debtor's pre-petition services.
 
 
 35
 The court did not, however, find Ryerson dispositive. Instead the court concluded:
 
 
 36
 [T]he Ryerson result does not determine the present matter. The payments the debtor receives were determined neither by the length of her service nor by a prepetition contract obligation. There was no certainty of any payments based upon termination at the time of the petition filing. The payments arose from the debtor's postpetition decision to resign from her job and the acceptance of that decision by her employer.
 
 
 37
 (Id. at 6.)
 
 
 38
 Thus, in both Ryerson and Bruneau the crucial question was not whether the funds in question could be deemed "property" within the meaning of 11 U.S.C. Sec. 541. Under the expansive construction courts have given the term, there can be little doubt that rights to post-termination funds, no matter what their designation (e.g., contract value, commissions), qualify as "property" for purposes of the bankruptcy code. The crucial inquiry, instead, is when those property interests came into existence. Read together, Ryerson and Bruneau would seem to indicate that a future interest will not become a Sec. 541 property right until it has, in effect, vested; or put another way, until the conditions that go to the creation of the right have been satisfied.
 
 
 39
 In Ryerson, despite the fact that the court refers to a contingent interest, the debtor's right to the disputed funds had actually vested by the time he had filed his petition. In other words, the fact that the debtor would receive the disputed funds was no longer in doubt. In Bruneau, by contrast, the condition whose fulfillment would give rise to a Sec. 541 property interest occurred only post-petition; as of the filing of the petition, the question of whether the debtor would ever receive the buy-out proceeds, let alone when such receipt would occur, had not been resolved.
 
 
 40
 As was the situation in Bruneau, the debtor's property right here did not accrue until after a bankruptcy petition had been filed. Only after being terminated would DeMarco then become entitled to post-termination commissions, and even then, whether such funds would actually be forthcoming was far from a certainty. Indeed, the instant action arguably presents an even stronger case for not finding a property interest under Sec. 541 than does Bruneau. Whereas the debtor in Bruneau could, herself, create her property interest by exercising her option to terminate her employment, DeMarco was faced with a contingency over which he had no control. He could only hope that clients with whom he had previously contracted on behalf of the Group would continue to renew their orders. That they would do so was not, of course, a foregone conclusion as of the time DeMarco filed for bankruptcy. Accordingly, defendants challenge to DeMarco's standing is without merit.[4]
 
 B.
 
 41
 Next, defendants argue that this court should judicially estop DeMarco from asserting his right to post-termination commissions.[5] In Reynolds v. Commissioner of Internal Revenue, 861 F.2d 469, 472-73 (6th Cir.1988) (citations omitted), this court stated:
 
 
 42
 The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. The purpose of the doctrine is to protect the courts "from the perversion of judicial machinery." Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,' " "blowing hot and cold as the occasion demands," or hav[ing] [one's] cake and eat[ing] it too." Emerson's dictum that "a foolish consistency is the hobgoblin of little minds" cuts no ice in this context.
 
 
 43
 Judicial estoppel is appropriate in this instance, defendants contend, because of DeMarco's failure to disclose his right to post-termination commissions in both his bankruptcy and divorce proceedings. As defendants argue: "Clearly, having egregiously deceived his creditors, his wife, and two courts, DeMarco's belated claim to a long forgotten contract cannot be countenanced by this Court. Having twice before obtained judicial relief inconsistent with the rights he now claims, DeMarco should be judicially estopped from cynically manipulating this Court." To allow DeMarco to claim this right now that it benefits him would result in precisely the threat the doctrine is designed to prevent: a perversion of the judicial process.
 
 
 44
 Defendants' position, however, presupposes the existence of an inconsistency. No such inconsistency exists here. With regard to his bankruptcy proceeding, as we have already determined, DeMarco's right to termination commissions did not accrue for purposes of the Bankruptcy Code until after DeMarco filed his Chapter 7 petition. With regard to his divorce proceeding, DeMarco's wife testified that "for purposes of the property settlement, she had no interest in any assets related to plaintiff's business; she merely wanted the house, cars, and various other property." We do not feel that DeMarco's conduct in either proceeding is inconsistent with his current position and, therefore, we find judicial estoppel inappropriate under the circumstances.
 
 C.
 
 45
 Defendants also claim that the district court erred in admitting secondary evidence in contravention of the best evidence rule. This court reviews decisions of a district court regarding the admission or exclusion of evidence under an abuse of discretion standard. Hill v. Marshall, 962 F.2d 1209, 1214 (6th Cir.1992), cert. denied, 113 S.Ct. 2992 (1993). When reviewing for an abuse of discretion, this court "must view the evidence in the light most favorable to its proponent, giving the 'evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.' Abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." Laney v. Celotex Corp., 901 F.2d 1319, 1320-21 (6th Cir.1990).
 
 
 46
 Rule 1002 of the Federal Rules of Evidence provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." The best evidence rule, then, is something of a misnomer. The rule is perhaps more accurately dubbed the original document rule, for instead of requiring the "best" evidence in every case, the rule actually requires the production of an original document rather than a copy. See Seiler v. Lucasfilm, Ltd., 808 F.2d 1316, 1318 (9th Cir.1986), cert. denied, 484 U.S. 826 (1987). By its own terms, the rule is implicated only in instances where the contents of a writing, recording, or photograph are at issue.
 
 
 47
 Defendants argue that the "best evidence rule is indisputably implicated in this case since the foundation of DeMarco's case depends on the contents of the 1965 written contract." In light of DeMarco's failure to produce the contract, defendants contend, the district court's decision to admit secondary evidence as to the contract's provisions constitutes an abuse of discretion. Moreover, defendants maintain, neither exception to Rule 1002 is applicable to the instant case. These exceptions are contained in Rule 1004, which states in relevant part:
 
 
 48
 The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if--
 
 
 49
 (1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or
 
 
 50
 (2) Original not obtainable. No original can be obtained by any available judicial process or procedure[.]
 
 
 51
 Although we agree with defendants that DeMarco's suit for commissions rests ultimately on the contents of the 1965 written contract and, therefore, that the best evidence rule does apply here, we conclude that this action fits squarely within the exception provided for by Rule 1004(1). "Rule 1004 does not contain an independent requirement that a search be conducted; rather, the concept of a diligent search is an avenue by which the larger issue of the document's destruction may be proved." United States v. McGaughey, 977 F.2d 1067, 1071 (7th Cir.1992), cert. denied, 113 S.Ct. 1817 (1993). Here, we are persuaded that DeMarco conducted, in good faith, a reasonably diligent search for the original copies of the 1965 written contract. That his search turned out to be futile, in our estimation, provides sufficient proof that all copies were either lost or destroyed. The 1004(1) exception to the best evidence rule therefore applies, and for this reason, defendants' challenge to the district court's admission of secondary evidence concerning DeMarco's right to post-termination commissions must fail.
 
 D.
 
 52
 Even assuming the district court properly admitted the disputed secondary evidence, defendants argue, the court erred in refusing to grant judgment as a matter of law for defendants. In Michigan and under federal law, judgment as a matter of law "may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." Toth v. Yoder Co., 749 F.2d 1190, 1194 (6th Cir.1984) (citation omitted). As this court stated in Toth:
 
 
 53
 The issue raised by a [judgment as a matter of law motion] is whether there is sufficient evidence to raise a question of fact for the jury. This determination is one of law to be made by the trial court in the first instance. In determining whether the evidence is sufficient, the trial court may not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. An appellate court, when reviewing the trial court's decision, is bound by the same standard.
 
 
 54
 Id.
 
 
 55
 Specifically, defendants contend that "because DeMarco was suing on a purportedly lost writing, the elements of his prima facie case mandated proof by clear and convincing evidence of, inter alia, the contents and loss of the writing." In addition, defendants maintain that "DeMarco's proofs as to the content and loss of the writing had to be 'highly probable' for the jury to find in his favor." Defendants conclude that "[b]ecause DeMarco's evidence was legally insufficient to establish that the contract contained the life-of-the-part term, and that the contract is lost, DeMarco should not have been permitted to go to the jury on his theory of the case."
 
 
 56
 We reject defendants' characterization of the evidence as insufficient to withstand a motion for judgment as a matter of law. To the contrary, we conclude that, "viewed in the light most favorable to the party against whom the motion is made," the evidence was sufficient to create a question for the jury.
 
 E.
 
 57
 Defendants next argue that DeMarco's contractual claim for post-termination commissions fails for indefiniteness.[6] We review questions of contract indefiniteness using a de novo standard. Erskine v. Consolidated Rail Corp., 814 F.2d 266, 269 (6th Cir.1987). Defendants cite a leading authority's description of the doctrine of indefiniteness:
 
 
 58
 A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of the accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of the agreement, have often been held to prevent the creation of an enforceable contract.
 
 
 59
 (Appellant's brief at 40) (citing 1 A.L. Corbin, Corbin on Contracts Sec. 95 (1963)). See Linnen v. Ken Brown Leasing Corp., 146 N.W.2d 719, 721 (Mich.Ct.App.1966) (contract fails for indefiniteness where the record lacks proof that the parties "reached agreement on the terms under which they would be bound."). Defendants maintain that parties seeking to prove the terms of oral or lost written contracts must do so with clear and convincing evidence.[7]
 
 
 60
 According to defendants, "Demarco's claim for life-of-the-part commissions hangs exclusively on his asserted, unrefreshed recollection of three words purportedly spoken by Moeller 27 years ago." At trial, DeMarco provided the following testimony: "Mr. Moeller said he would continue to pay me commissions as long as he made the part. If I brought the business in, that part, I would get commission[s] as long as he made it." (App. at 327; emphasis added.) As commonly understood, the term "as long as," defendants urge, does not establish the existence of a life-of-the-part agreement. As DeMarco did not offer additional evidence supporting his position, defendants conclude, "the record contains no evidence from which the trial court could ascertain that the parties agreed to be governed by a life-of-the-part commission term[.]"
 
 
 61
 Defendants resort to dictionary definitions of the phrase "as long as" to bolster their argument. One such definition, offered by Webster's Encyclopedic Unabridged Dictionary of the English Language, states: "provided that; since: 'As long as you feel that way about it, we'll forget about it.' " In their reply brief, defendants discuss other possible meanings:
 
 
 62
 The Random House Dictionary of the English Language lists "provided that" (Moeller's understanding) as the predominant meaning, while listing "during the time that" (DeMarco's understanding) as the least common. But Webster's New World Dictionary offers the exact opposite interpretation, listing "of the same length as" (DeMarco's understanding) as the predominant meaning, and "provided that" (Moeller's understanding as the least common.
 
 
 63
 (Reply brief at 19 n. 8.) For good measure, DeMarco cites yet another dictionary, The American Heritage Dictionary of the English Language, which provides this definition of "as long as":
 
 
 64
 1. during the time that: "I'll stay as long as I can."
 
 
 65
 2. inasmuch as; since: "As long as you're up, get me a drink."
 
 
 66
 3. under the condition that; provided that: "So long as we don't understand it too well, every other language is poetry.
 
 
 67
 We do not feel that a resolution of defendants' contractual indefiniteness argument hinges on a battle of dictionaries. Instead, the assurance Moeller gave to DeMarco and about which DeMarco testified must be appreciated in the context in which it was given. In 1970, life-of-the-part provisions, while perhaps not standard, were clearly not a novelty within the industry. That "as long as" would be, in the eyes of both Moeller and DeMarco, tantamount to "life-of-the-part" does not defy reason. See Kingsley Assocs. v. Del-Met, Inc., 918 F.2d 1277, 1278 (6th Cir.1990) ("The representative ... sued the defendant ... upon an alleged oral contract that provided that [the representative] would be paid commission for all sales of any part [the representative] sold for [the defendant] to the automobile industry for as long as the automobile industry customer reorders the part; that is, for 'the life of the part.' ") Accordingly, we find defendants' contention that DeMarco's right to post-termination commissions fails for indefiniteness to be without merit.
 
 F.
 
 68
 In their penultimate argument, defendants assert that the trial court erred in not granting their motion for a new trial. This court applies an abuse of discretion standard in reviewing a district court's grant or denial of a new trial, and "the jury's verdict should be accepted if it was reasonably reached." Portage II v. Bryant Petroleum Corp., 899 F.2d 1514, 1523 (6th Cir.1990). In Portage II, this court set forth the following analytical framework:
 
 
 69
 In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence....
 
 
 70
 "[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results would be more reasonable." Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached.
 
 
 71
 Id. at 1523-24 (citations omitted).
 
 
 72
 A new trial is warranted in the instant action, defendants argue, because "[t]he jury's finding that DeMarco proved the loss of the contract and that it contained the purported 'life-of-the-part' term, is against the clear weight of the evidence[.]" In support of their argument, defendants cite, inter alia, the testimony of Robert McAuliffe, an expert witness at trial. McAuliffe, who "is familiar with manufacturer representative contracts as they pertain to the automotive industry," testified that he had "never known of a manufacturers representative contract of the kind described by DeMarco." To the contrary, "McAuliffe testified that the 1% for one year provision, as testified to by Moeller and Myers, reflects 'common, normal practices.' "
 
 
 73
 Notwithstanding McAuliffe's testimony, we are satisfied that "life-of-the-part" is indeed part of the industry lexicon. This court recognized as much in Kingsley Associates, Inc. v. Del-Met, Inc., 918 F.2d 1277. The decision in the instant case was predicated on an assessment of relative credibility. The parties gave antithetical accounts of what had transpired between them, and the jury was called upon to resolve all contradictions. The jury obviously deemed DeMarco's version the more credible. Although we may not have necessarily reached the same conclusion had we initially decided the matter, we do feel that the jury verdict here was one that "could reasonably have been reached." We find therefore that the district court did not abuse its discretion in denying defendants' motion for a new trial.
 
 G.
 
 74
 Finally, defendants mount two challenges to the amount of their judgment. First, defendants claim that the amount is overstated because it includes commissions attributed exclusively to Ken-Dec sales.[8] These commissions should not be included in the total judgment because, defendants claim, "[t]he jury's finding of an express contract between Ohio Dec and Ken-Dec belies the uncontroverted evidence that no such express agreement was ever made."[9]
 
 
 75
 The fact that there may not have been an express agreement with respect to commissions derived from Ken-Dec sales, however, is not dispositive. The jury evidently concluded that the parties had entered into an implied agreement whereby the terms of their pre-existing agreement would extend to Ken-Dec.[10] Again, the jury was faced with a question of credibility, and again, the jury sided with DeMarco. We do not feel that there is sufficient evidence to disrupt the jury's decision.
 
 
 76
 Defendants' second challenge to the judgment amount involves the district court's computation of pre-judgment interest. Defendants contend the district court erred by taking the jury award of $858,825 and computing the interest from the day the original complaint was filed to arrive at an interest figure of $263,748. The operative Michigan statute provides: "[F]or complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action shall be calculated ... from the date of filing the complaint...." Mich.Comp.Laws Ann. Sec. 600.6013(6). Notwithstanding the language of this statutory provision, Michigan law, defendants contend, requires that "if a sum does not become payable until a date subsequent to the filing of the complaint, then prejudgment interest on that sum does not begin to accrue until the date payable." See Farmers Ins. Group v. Lynch, 465 N.W.2d 21, 22 (Mich.Ct.App.1990); Central Michigan Univ. Faculty Ass'n v. Stengren, 370 N.W.2d 383, 386 (Mich.Ct.App.1985). According to defendants' calculations, the district court overstated the amount of interest due by $41,597.
 
 
 77
 We are not persuaded that this is an occasion justifying a departure from the clear and unambiguous language of Sec. 600.6013(6). The Michigan Court of Appeals dealt with an analogous situation in Om-El Export Co. v. Newcor, Inc., 398 N.W.2d 440 (Mich.Ct.App.1986) (refusing to follow Central Michigan ). In Om-El, an export company brought a breach of contract action against a manufacturer. Finding in favor of the plaintiff, the trial court awarded damages, including damages for future commissions. On appeal, the defendants challenged, inter alia, the trial court's computation of pre-judgment interest. Noting that "the purpose of awarding prejudgment interest is not only to compensate for the delay in receiving money but to compensate for the expenses and inconveniences involved in litigation," the appellate court held that "a straightforward interpretation of [600.6013(6) ] allows interest on a money damages award from the date of the filing of the complaint." 398 N.W.2d at 445. See also Goins v. Ford Motor Co., 347 N.W.2d 184 (Mich.Ct.App.1983). The court added: "Had the Legislature intended to provide differently in the case of awards involving future damages, it could easily have done so by express provision in the statute." 398 N.W.2d at 445.
 
 
 78
 We hold that Om-El governs this case, but see Farmers Ins. Group, 456 N.W.2d 21 (disagreeing with Om-El ), and accordingly, we decline to disturb the district court's award of prejudgment interest.
 
 
 79
 AFFIRMED.
 
 
 80
 ENGEL, Senior Circuit Judge, concurring.
 
 
 81
 I concur fully with the majority's careful opinion, including that portion which deals with Michigan's prejudgment interest law, MICH.COMP.LAWS Sec. 600.6013. But in light of the considerable difficulty the Michigan Courts of Appeals have encountered in the application of the prejudgment interest rule, I write separately to express my views concerning the proper method of calculating prejudgment interest in cases, like this one, where the damage accrues over an extended period of time.
 
 
 82
 As both a state and federal trial judge in Michigan, it always seemed to me that Michigan's prejudgment interest law could and should be made to work the way I believe the legislature intended--to ensure that prevailing plaintiffs suffer no loss of interest due to litigation delays, but without imposing excessive and unrealistic interest burdens on defendants resisting judgment in good faith. In enacting the law awarding prejudgment interest, the Michigan Legislature sought to prevent recalcitrant defendants from using delay tactics to retain control over disputed funds. Money, of course, has a time value which we call "interest," and a savvy defendant can often profit substantially by delaying an adverse judgment. Prejudgment interest charges represent the time value of the money awarded to the plaintiff from the date of filing until the date of satisfaction of the judgment. By disgorging the profits a defendant earns during the pendency of litigation, the Michigan Legislature sought to deter defendants from dilatory tactics designed solely to stall the collection of an inevitable adverse judgment. But we must be wary of over-calculation of the interest charge, because the Legislature certainly did not wish to interfere with a citizen's right to defend a lawsuit in good faith. While under-calculation of the prejudgment interest leaves the defendant with an incentive to delay, over-calculation imposes an unwarranted penalty on parties who in good faith defend against a lawsuit.
 
 
 83
 To apply the Michigan prejudgment interest rule with precision, the court's task is to accurately calculate the time value of the judgment from the date of filing to the date of satisfaction of the judgment. Since the plain terms of the prejudgment interest law call for interest to be calculated "from the date of filing the complaint," the crucial inquiry becomes: what sum should be used as the base upon which interest charges are calculated? I would submit that only by projecting the value of pre-filing damages forward to the date of filing, and discounting post-filing damages back to the date of filing, can a court arrive at a single figure upon which interest can fairly be charged. This one consolidated figure--representing as of the date of filing the present value of the harm suffered by the plaintiff--should be subjected to interest charges for the period from filing to satisfaction of the judgment. Interest charged on this sum at the prevailing rate of interest accurately forecasts the profit a recalcitrant defendant stands to earn by holding onto the plaintiff's money.
 
 
 84
 I believe this technique represents the ideal application of the prejudgment interest rule for cases where the damages are incurred over a period of time, because it deters needless delay without unfairly punishing a defendant resisting judgment in good faith. In a number of trials over which I presided in federal and state court, this technique was used with considerable success. Yet I recognize that many jurors, and some judges and lawyers, are not well-versed in such financial calculations, even though standard compound interest rate charts can simplify the computations. Usually the parties tolerate a much simpler method either by agreement or by sufferance. But with proper instructions I have seen jurors competently manage such calculations.
 
 
 85
 Since counsel in this case did not request any of the calculations I have proposed, I am content to accept the method actually employed and therefore to concur in the majority opinion.
 
 
 
 [1]
 Ken-Dec was not added to the Group until the late 1960s
 
 
 [2]
 DeMarco believes this attorney to be a Mr. Draper of Draper Mansour & Daniels. This belief, however, seems speculative at best. In his brief, DeMarco described his effort to track down the attorney he had retained in 1965:
 [DeMarco] attempted, however, with the help of his former wife, Carole, to identify that attorney. The two reviewed telephone directories and bar association directories for 1965 at the University of Michigan Library at Flint. After identifying several possible names from these directories, Demarco visited what he thought to be the building where he met with this attorney on Clio Road. He learned that the firm of Draper, Mansour & Daniels had maintained an office there at one time. He visited the office of the Draper firm in Flint and spoke to a secretary there about his search for a 1965 contract that a lawyer with the firm may have drafted. The secretary consulted with Mr. Draper, who advised her that the firm had no archives form 1965. She gave this information to DeMarco....
 DeMarco also attempted to identify the attorney through checking account records. His former wife maintained those records but had none going back to 1965. He attempted to obtain a copy of the check used to pay the attorney from his bank at that time. The bank advised, however, that it only retained such records for a period of ten years.
 (Appellee's Brief at 11.)
 
 
 [3]
 DeMarco testified that he kept his contract in the top drawer of a locked file cabinet. As to how the contract was lost, he could definitively assert only that he "did not destroy the contract at any time." DeMarco did speculate, however, that perhaps one of his former secretaries had inadvertently discarded the contract while reorganizing the materials within the file cabinet
 
 
 [4]
 DeMarco argues that defendants have confused the nonwaivable standing doctrine with the related concept of real party in interest under the Rule 17 of the Federal Rules of Civil Procedure. The standing doctrine, DeMarco urges, relates only to the public law context; Rule 17, on the other hand, is implicated in suits between private parties. See Malamud v. Sinclair Oil Corp., 521 F.2d 1142, 1147 (6th Cir.1975); Lucas v. Lucas, 946 F.2d 1318, 1322 n 6 (8th Cir1991) (" 'Standing' is a constitutional doctrine regarding one's right to challenge a governmental action"), Federal Deposit Ins. Corp. v. Bachman, 894 F.2d 1233, 1236 (10th Cir.1990) ("Using the term 'standing' to designate real-party-in-interest issues tempts courts to apply standing principles outside the context in which they were developed."). Rule 17 provides in pertinent part:
 No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest
 Fed.R.Civ.P. 17(a)
 DeMarco asserts that defendants "standing" argument is, in essence, a real-party-in-interest argument. Defendants waived their right to raise a Rule 17 objection, DeMarco further asserts, by failing to raise such objection in the district court. Although we do hold that this court has jurisdiction over defendants' appeal, our holding is not based on DeMarco's Rule 17 argument. Notwithstanding DeMarco's claim that standing is generally considered a public law concept, we have previously found the doctrine to be applicable in suits like the one presently before the court. See Bauer, 859 F.2d at 441 (citation omitted) (" 'It is well settled that the right to pursue causes of action formerly belonging to the debtor--a form of property under the Bankruptcy Code--vests in the trustee for the benefit of the estate.' The debtor has no standing to pursue such causes of action ") (emphasis added).
 
 
 [5]
 DeMarco maintains that defendants have waived their judicial estoppel argument by not raising it in the district court. See Altman v. Altman, 653 F.2d 755, 757-58 (3d Cir.1981) (refusing to consider issue of judicial estoppel when raised for the first time on appeal). Altman, however, is contrary to the overwhelming weight of the authority. Underlying the doctrine of judicial estoppel is the desire to protect the integrity of the judiciary, not individual litigants. Teledyne Indus. v. N.L.R.B., 911 F.2d 1214, 1219-20 (6th Cir.1990); In the Matter of Cassidy, 892 F2d 637, 641 n. 2 (7th Cir.), cert. denied, 498 U.S. 812 (1990) ("[P]rejudice to the opponent is not a necessary element of judicial estoppel, thus contrasting judicial estoppel from the more familiar equitable estoppel) As such, even had defendants not raised the argument on appeal, we could sua sponte consider whether judicial estoppel is appropriate under the facts presented. See Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990), cert. denied, 111 S.Ct. 2915 (1991) ("Because it is intended to protect the integrity of the judicial process, [judicial estoppel] is an equitable doctrine invoked by a court at its discretion")
 
 
 [6]
 DeMarco argues that defendants failed to preserve this issue for appeal. Although defendants did raise this issue on motions for judgment as a matter of law made at the close of DeMarco's case and again at the close of their own case, they did not reassert the issue in their post-trial motion for judgment
 
 
 [7]
 DeMarco, on the other hand, claims that the terms of oral contracts need only be proved by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 286 (1991) (presumption exists that preponderance of the evidence standard governs in civil actions between private litigants "unless 'particularly important individual interests or rights are at stake." ') (citations omitted); Blue Cross & Blue Shield of Michigan v. Milliken, 367 N.W.2d 1, 44 (Mich.1985) ("It is generally well established that issues of fact in civil cases are to be determined in accordance with the preponderance of the evidence with the burden of persuasion placed upon the party asserting the claim."). Because we conclude that DeMarco satisfies even the higher "clear and convincing" burden, we do not resolve this dispute
 
 
 [8]
 Ken-Dec sales comprise $278,855 out of the total $858,825 awarded by the jury
 
 
 [9]
 Defendants argue that the following testimony offered by DeMarco, himself, confirms the lack of such an agreement:
 Q. The fact of the matter is, Mr. DeMarco, when you first began representing Ken-Dec in 1974 you had no discussions with Chuck Moeller about your compensation post termination, did you?
 A. Not with respect to specifically Ken-Dec, no. There was no discussion at all. We just--life went on as normal.
 Q. Life went on, you were paid the same three percent commission--
 A. Yes.
 Q. --that Ohio Dec and Edgerton were paying you?
 A. Yes, that's correct.
 Q. And at no time did you and Chuck Moeller expressly agree that Ken-Dec would pay you any post termination commissions at all?
 A. No, but it certainly was my understanding and expectation that that would happen.
 Q. But yet no discussions to that effect, correct?
 A. No, I didn't
 (App. at 508-09.)
 
 
 [10]
 On cross-examination, Moeller seems to have conceded the fact that Ken-Dec, once it was formed, became part of the deal between defendants and DeMarco:
 Q. ... You mentioned the deal you think that was struck between you and Mr. DeMarco in '65. Did that deal apply to your metal group, the automotive operations?
 A. Yeah, basically the metal group, yes.
 Q. And that consists of Ohio Dec. which legally I think we lawyers call a parent corporation, and then the subsidiaries are part of the Ohio Metal Group?
 A. Yes, sir.
 Q. And that would include Ken-Dec and Edgerton, is that true?
 A. At that time Ken-Dec would have been the only one.
 Q. But Ken-Dec came on the scene what, about 1974-1975?
 A. I think we built it in 1969-1970 '69 or so.
 Q. And that became part of the deal as I understand it?
 A. Yes.
 (App. at 533-34.)