186 B.R. 35 (1995)
In re MACMILLAN INC., et al., Debtors.
In re MCC GAO, INC., f/k/a Official Airlines Guides, Inc. et al., Debtors.
The MAXWELL MACMILLAN REALIZATION LIQUIDATING TRUST and MCC GAO, Inc., Counterclaim-Plaintiffs,
v.
Sheldon J. ABOFF, Counterclaim-Defendant.
Bankruptcy Nos. 93 B 45625 (TLB), 93B 44970 (TLB) and 93B 44971 (TLB). Adv. Nos. 94-8495A (TLB), 94-8496A (TLB).
United States Bankruptcy Court, S.D. New York.
August 9, 1995.
As Amended August 10, 1995 and August 15, 1995.
*36 *37 Milbank, Tweed, Hadley & McCloy (George Brandon and John M. Conlon, of counsel), New York City, for joint adm'rs.
Solovay & Edlin, P.C. by Richard A. Edlin, Ellen G. Zindler, New York City, for Sheldon J. Aboff.

DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT
TINA L. BROZMAN, Bankruptcy Judge.
Sheldon J. Aboff, a former employee of various U.S. businesses included in the worldwide holdings of the late Robert Maxwell and his family, seeks summary judgment[1] *38 on his two $35 million proofs of claim. The claims are asserted against Macmillan, Inc. ("Macmillan") and MCC/GAO, Inc. (formerly known as Official Airlines Guide, Inc. and referred to in this opinion as "OAG"). In response to the assertion of the claims the two estates[2] interposed sizable counterclaims against Aboff. He seeks summary judgment on those as well. Aboff was no ordinary employee; having worked for many years in one or another of Maxwell's enterprises, he acted more or less as Robert Maxwell's U.S. "man on the spot." The debtors claim that whatever his role in other Maxwell enterprises, Aboff did not work for them. Thus, they too seek summary judgment. However, the two estates also seek to dismiss his proofs of claim on grounds other than their merits, namely, Aboff's alleged evidence tampering and deceit under oath.

I.
A. The Relevant Part of the Corporate Map and the Role of David Shaffer
Certain background is necessary to understand the genesis of the present disputes. Except where noted, the facts are not contested. Maxwell's empire had two distinct components, those companies owned wholly by Maxwell and his family and those owned partly by the Maxwell family and partly by the public. The components were known respectively as the "private side" and "public side." The "public side" and "private side" labels serve to identify the type of ownership of particular corporations, be they domestic or foreign. The private side corporate parent is believed to have been Headington Investments, Ltd. ("Headington"), a United Kingdom corporation, and the public side corporate parent was Maxwell Communications Corporation, plc ("MCC"), another United Kingdom corporation. The two parents were not corporate strangers, however, for Headington owned part of MCC, functioning as the vehicle through which the Maxwell family maintained part ownership of the public side. Whereas ultimate corporate ownership of the public and private sides was in U.K. entities, there were lesser holding companies as well in both the public and private corporate chains. The U.S. private side businesses were owned by a U.S. holding company named PH(US)Inc. ("PH(US)I"), which is a contraction of Pergamon Holdings (United States), Inc. PH(US)I, in turn, was owned, directly or indirectly, by Headington.
Having briefly regarded the entire corporate map, we return now to examine more closely one piece of it, the public side, embracing both the debtors against which Aboff has asserted his claims. The public side parent, MCC, had two assets which were its most valuable, its direct or indirect stock ownership of two U.S. corporations, Macmillan, the well-known publishing company, and OAG, publisher of the Official Airlines Guide. These two companies and their subsidiaries constituted about eighty percent of the value of the public side. Both OAG and Macmillan were acquired by MCC in 1988, OAG from Dun & Bradstreet and Macmillan in a hostile takeover.
Prior to its acquisition by MCC, OAG had as its president one David Shaffer. He agreed to remain on with MCC after OAG's sale. Following Macmillan's entry into the Maxwell fold, Shaffer's duties were expanded to include management not only of OAG but of Macmillan as well. He also assumed management of the electronic information businesses of the U.S. subsidiaries of MCC and Macmillan, known collectively as the Electronic Publishing Group, all of which were public side companies.
At the time MCC purchased OAG, it had also obtained from Dun & Bradstreet an option to purchase a separately incorporated travel agency, Thomas Cook Travel, which also happened to be managed by David Shaffer. MCC did not exercise this option but instead assigned it to the private side, which *39 purchased the company and renamed it TCTI, Inc. Neither Macmillan nor OAG had any ownership interest in TCTI, Inc. TCTI, Inc. did not operate alone but joined with a travel business owned by a couple named Paresky to form Thomas Cook Partnership ("TCP"). Thus the private side had fifty percent ownership of TCP through its ownership of TCTI, Inc. Because of his prior involvement with Thomas Cook Travel at Dun & Bradstreet, Shaffer agreed to become an officer and director of TCTI, Inc. He thereby oversaw the management of the private side's interest in TCP, although he did not run TCP's business.
Thus, to recap just a bit, in the early part of his tenure with Maxwell, Shaffer managed OAG, Macmillan and the Electronic Publishing Group (all public side) and he oversaw TCTI's investment in TCP (private side). In 1989 Shaffer was appointed executive vice president of Macmillan and the next year was elevated to the office of president, with responsibility for the management of all of the MCC companies located in the U.S. At this point, the Electronic Publishing Group ceased to exist; its component companies were integrated into various divisions of Macmillan. In 1991, Shaffer was appointed as MCC's chief operating officer and his responsibilities were augmented to cover worldwide operations for the companies under his management. A month later, Shaffer became managing director of MCC. This role ceased when, later that month, MCC was plunged into bankruptcy and its management was replaced by a team of joint administrators appointed by the High Court in London. (Shaffer remained, however, as chairman, president and chief executive officer of Macmillan and as chairman of OAG until their sale, described below.)
B. The Bankruptcies of MCC, Macmillan and OAG
After Robert Maxwell's death, his empire faltered, with bankruptcy proceedings ensuing in both the U.S. and the U.K. for a host of companies. MCC filed primary proceedings in both countries. Those two proceedings, a chapter 11 reorganization and a British administration, were handled in tandem. They resulted in a chapter 11 plan and a scheme of arrangement which were interdependent. (For ease of reference, the plan and scheme will be called the "MCC plan.") The MCC plan contemplated that both Macmillan and OAG were to be sold as going concerns. After confirmation of the MCC plan, Macmillan and OAG each filed "prepackaged" chapter 11 cases, that is, cases where the chapter 11 petitions were accompanied by plans which had the approval of major parties in interest. Macmillan's business was sold and, pursuant to its plan, the proceeds were set aside to satisfy the claims of creditors, with the remainder to be upstreamed to MCC, as Macmillan's shareholder. In furtherance of that objective there were created two trusts, the Maxwell Macmillan Realization Liquidating Trust (the "Realization Trust") and the Maxwell Macmillan Proceeds Liquidating Trust (the "Proceeds Trust"). These trusts were formed to (i) liquidate all assets, including some subsidiaries not sold along with Macmillan and (ii) distribute the proceeds to creditors holding allowed claims. The trustees were empowered to object to and resolve, by litigation or settlement, disputes respecting claims and to prosecute all causes of action of the debtor (with certain minor exceptions not here relevant).
C. Aboff's Relationship with the Maxwells and their Companies
With that background in place, we move still further back in time than when we began and turn to Sheldon Aboff's role with the Maxwells and their growing U.S. holdings. Although the facts regarding the early years are undisputed, the parties hotly contest Aboff's role not long after Shaffer joined the scene. Indeed, as will become apparent, the disputes are sufficiently material to preclude the grant of summary judgment.
Aboff worked as an auditor for Price Waterhouse from 1967 until 1975. One of the firm's main clients was Pergamon Press, Inc. ("Pergamon"), a U.S. publishing company which at the time was Robert Maxwell's principal holding in the United States. Parenthetically, throughout those years all of Robert Maxwell's companies were privately *40 owned. Over the course of time Aboff became the primary accountant from Price Waterhouse to work with Pergamon. In 1975, Maxwell invited Aboff to join Pergamon as treasurer and chief financial officer, an offer that Aboff accepted. As the years passed, Aboff was given responsibility for most aspects of the operations of Pergamon other than publishing and marketing. Ultimately, he was promoted to vice chairman of Pergamon in 1981, being responsible for finance, administration and operations. In 1987, Aboff was named president of PH(US)I, which, as mentioned earlier, was the holding company for the private side interests in the U.S. At the end of 1987 Pergamon was sold to Maxwell Communication Corporation, N.A., then a U.S. subsidiary of MCC (identified earlier as the U.K. parent of the public side). Those facts concerning the relationship between Maxwell and his companies on the one hand and Aboff on the other are the only ones which are undisputed. The parties vehemently disagree about whether Aboff ever worked for any of the public side entities, most especially, Macmillan and OAG.
Aboff claims that by virtue of the sale to Pergamon to the public side, he became a public side employee, specifically, of Macmillan (into which Maxwell Communication Corporation, N.A. was merged), and that he remained as such until his termination in December, 1991. He asserts that he joined Macmillan in November, 1988, and assumed the official title of "Vice President  Special Projects," reporting directly to Robert and Kevin Maxwell (Kevin being Robert's son). According to his version of events, in the fall of 1989 Aboff became a group vice president of Macmillan and remained an executive at Macmillan working either on Macmillan matters or on assignments given to him by Macmillan officers and directors. This recitation is somewhat truncated given that virtually everything which Aboff says about his relationship with and work for the public side is disputed by the debtors. Suffice it to say that the work which Aboff performed and the identity of the companies for whose benefit and at whose behest he worked are all at issue. Indeed, the parties are even at loggerheads about what titles Aboff held at the various companies.
The debtors claim that Aboff never had any role at OAG but that because OAG had the best benefits, Shaffer granted Aboff's request in October, 1989, to be placed on the OAG payroll. The debtors admit that Aboff had a role at the Electronic Publishing Group (which comprised subsidiaries of MCC and Macmillan and was therefore public side). They state that Aboff was not well regarded at Macmillan but was viewed as a Maxwell "spy" as a result of which Shaffer thought it best to remove Aboff from Macmillan. In their version of events, he began to assume an increasing role at TCP and reported in that capacity to Shaffer. In early 1990, and here the parties agree, Aboff relocated his office from Manhattan to Greenwich, Connecticut, to a Thomas Cook travel agency branch. From this time on, the debtors say, Aboff continued to report to Shaffer but his business cards and stationery identified him only as a representative of the private side and he no longer appeared on lists showing executive signing authority at Macmillan. Aboff says that after the move he continued to perform all of the duties and responsibilities he was assigned as a Macmillan executive employee and to report to Macmillan officers. In essence, Aboff says, he worked at TCP as a direct assignment from his employer, Macmillan, pursuant to an alleged employment agreement with Macmillan about which more will be said later.
One wonders how these versions can be so disparate. Part of the explanation may lie in the controversy over how the public and private sides were operated. Aboff claims that until December, 1991, it did not make any difference to those working for Macmillan whether they performed services for a public or a private side company. Every department in the Macmillan organization was available to work on private side matters, he says, and the executive, real estate, tax, finance, accounting, human resources and legal departments did so on a regular basis. The debtors, on the other hand, assert that at all times the businesses and assets of the public and private sides were segregated and that the companies were separately incorporated, organized, audited, and financed. They state further that private *41 and public side companies each had their own officers, directors and employees; although the public side provided services to the private side from time to time, these services customarily were billed, or "charged back," to the company for which the services were provided.
D. Aboff's Proofs of Claim
Aboff's two proofs of claim hinge in large part on a photocopy of a letter agreement purportedly signed by Kevin Maxwell on Macmillan letterhead. It is Aboff's contention that this letter constitutes an employment contract with either Macmillan or OAG. As will be discussed later, the debtors challenge not only the substantive effect of this letter but also its authenticity.
In brief, Aboff seeks from the estates the following:[3]

(A) SALARY AND BONUSES:
(ii) his interest in the capital
 accumulation plan ................ $733,333[4]
(iii) a bonus for his effort in
 the sale of TCP ................. $3,000,000
(iv) a bonus for his effort in
 the sale of Pergamon
 Press ............................ $500,000
(B) CONTRACTUALLY MANDATED
 INSURANCE, PERQUISITES, AND
 EXECUTIVE FRINGE BENEFITS:[5]
(i) estimated value of all perquisites
 other than legal
 fees for the period beginning
 December, 1991, and
 ending December, 1993 $100,000
(ii) legal fees and costs covered
 either by officer and director
 insurance or company
 policy for the period
 beginning December,
 1991, and ending December,
 1993 ............................. $362,194[6]
(C) CONTRACTUALLY MANDATED
 POST RETIREMENT PENSION
 AND BENEFITS:
(i) pension claims ...................... $28,500,000
(ii) health insurance, life insurance,
 and "other" undetermined

In addition, Aboff amended his proofs of claim after the bar date had passed to seek damages for refusal to provide and specific misrepresentations as to the availability of director and officer and other related entities, claims against Aboff by the Arthur Anderson & Co. accounting firm[7], and the counterclaims made against Aboff in the debtors' objection to his proof of claim. Finally, another amendment seeks $1.2 million said to be due to Aboff from his account at Advest, Inc. as a result of liquidation of his holdings in the account to meet a December, 1991, margin call on stock as to which Aboff was only a stakeholder.
E. The Debtors' Counterclaims
The debtors have not only objected to Aboff's claims but have interposed counterclaims against him through the institution of adversary proceedings, as the bankruptcy rules mandate. The subject of these counterclaims is Aboff's alleged participation in Robert and Kevin Maxwell's diversion of Macmillan's assets to private side companies controlled by and held for the benefit of the Maxwells. These diversions of cash, stock certificates of Berlitz International, Inc. ("Berlitz") and tax refund checks are said to have aggregated some $29 million, to the detriment of Macmillan and its corporate parent, MCC. (Because Macmillan was solvent, after payment of its creditors, its remaining assets were upstreamed to MCC, as described earlier.) The debtors contend that these assets were diverted by means of unlawful transfers to Aboff personally and to PH(US)I, of which Aboff was president and a director.
*42 I will deal first with the stock certificates. Berlitz had issued 19 million common shares, 10.6 million of which belonged to Macmillan, giving Macmillan 56% ownership of Berlitz. The minority stockholders were investors who purchased their shares on the New York Stock Exchange. The debtors allege that in November, 1990, Macmillan's shares in Berlitz were transferred to a private side entity known as Bishopsgate Investment Trust, plc ("BIT") as nominee for Macmillan. Despite the nominee status, they allege, in the following months the shares were unlawfully transferred to various banks and financial service institutions and pledged to serve as collateral for loans advanced to private side companies. Among these alleged unlawful diversions is the transfer, in several stages, of a total of one million Berlitz shares by BIT to an account held in Aboff's name at Advest, Inc., a broker-dealer. The debtors assert that Aboff borrowed against the shares on margin and wired some $3.6 million in proceeds to PH(US)I. The wired funds were then allegedly used to fund the cash needs of the private side, to the detriment of Macmillan and, ultimately, MCC.
In December, 1991, 235,000 shares of Berlitz held in the Advest account were sold for a total of approximately $3.7 million to satisfy margin requirements on the account, leaving a total of 765,000 shares in that account. The debtors assert that in September, 1991, a Japanese company bid approximately $26.26 per share for a majority stake in Berlitz but that the offer could not be consummated because a majority of Macmillan's holding had been pledged by BIT. Macmillan is said to have been injured in that it eventually sold the remaining shares in the Advest account for only $23.75 per share. Because Aboff in an affidavit filed in an action other than this one swore that the Advest account contains only securities and cash dividends in which he has no beneficial interest, the debtors contend that there are no competing claims to the Berlitz shares or the remaining proceeds (some $18 million) from the sale of those shares.
Turning to the other asserted diversions, the debtors claim that Aboff, acting on Kevin Maxwell's instructions, transferred $500,000 from Macmillan's bank account to a PH(US)I account and thereafter sent the funds to the private side. Finally, the debtors allege that Aboff caused tax refunds belonging to two Macmillan subsidiaries to be deposited into a PH(US)I account and transferred to the private side.[8]

II.
With the factual backdrop, disputed and undisputed, in place, we move on to the motions themselves. I will treat with the issues in the following order: (1) the debtors' request for dismissal of Aboff's proofs of claim based upon his alleged evidence tampering; (2) the summary judgment motions with respect to the employment contract; (3) Aboff's amendments to his proofs of claim; (4) the standing of the Liquidating Trust to pursue counterclaims against Aboff; (5) the Berlitz-related counterclaims; and (6) the PH(US)I-related counterclaims. We begin, however, by setting forth the standards which guide a court when deciding a motion for summary judgment. It may seem a little odd to begin with the law regarding summary judgment when the first issue to be decided is the alleged evidence tampering. Bear in mind, however, that I have not had the benefit of an evidentiary hearing and many of the facts are disputed. Thus, it is appropriate to view the requested dismissal through the prism of summary judgment.
Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rules of Bankruptcy Procedure 9014 and 7056, provides that summary judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *43 no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); In re Ionosphere Clubs, Inc., 147 B.R. 855, 860 (Bankr.S.D.N.Y.1992). A fact is considered material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S.Ct. at 2510. In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir.1992); Knight v. U.S. Fire Insurance Co., 804 F.2d 9, 11 (2d Cir.), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).
The moving party initially bears the burden of establishing the absence of a genuine issue as to any material fact. Celotex Corp at 322-23, 106 S.Ct. at 2552-53; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); In re Ionosphere Clubs, Inc., 147 B.R. at 861. That burden can be satisfied by demonstrating the absence of evidence supporting the non-movant's case. Celotex Corp., 477 U.S. at 325, 106 S.Ct. at 2553-54. When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the non-moving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). The non-moving party may not defeat a properly supported motion for summary judgment by relying on self-serving and conclusory statements concerning the true nature of the facts. Wyler v. United States, 725 F.2d 156, 160 (2d Cir.1983). As the Supreme Court has noted, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. at 586, 106 S.Ct. at 1355-56; cf. In re Ionosphere Clubs, Inc., 147 B.R. at 861.
A. Aboff's Claims
1. Dismissal for Evidence Tampering and Deceit During Discovery
Aboff's asserted offenses are grounded in three pages of notes which were among those he produced during discovery and as to which he testified at his deposition. To understand the debtors' complaint we need to spend a few moments with the background facts. Remember that it is Aboff's position that he had a valid and enforceable employment agreement signed by Kevin Maxwell on behalf of Macmillan or, perhaps, OAG (since OAG acted as a paying agent). Both sides agree that a photocopy of such a letter exists, although for reasons which will be discussed, the debtors object to the admissibility of the letter in the absence of an original. They also differ as to whether it in fact created an employment relationship with either of the debtors.
Regardless, it is undisputed that a letter was drafted at some point and that in connection with that endeavor Aboff consulted the firm of Whitman & Ransom.[9] When questioned at his deposition as to his interpretation of that letter, Aboff referred to handwritten notes he took during a meeting he had with Kevin Maxwell on what he said he believed was March 27, 1990. Aboff testified that he had discussed with Kevin Maxwell all the relevant points that were reflected in the notes for that occasion. He specifically testified that the item numbered (1)(a) on the first page Bates stamped A00044, which he wrote, says in substance that his job definition was "confirm I'm out of Max[well]/Mac[millan] politics," (emphasis added). He also noted that item number (6) refers to the fact that were TCP (the private side partnership the debtors assert the agreement explicitly referred to) to be sold *44 he would "return to Macmillan." On his second page of notes, Aboff identified item number (9), which stated that his "continuing role in Max/Mac" would be his "availab[ility] for special projects".[10] The debtors contend that his deposition testimony should lead me to conclude that he was unambiguously asserting that the notes which he produced were contemporaneous with what he wrote down during one particular meeting with Kevin Maxwell.
At the time of Aboff's deposition, Whitman & Ransom's successor firm, Whitman Breed Abbot & Morgan, in response to Aboff's subpoena had produced but two documents, both of which were alleged draft employment agreements for Aboff. Following Aboff's testimony regarding the Whitman firm's role in drafting the purported contract, the debtors subpoenaed the firm. In addition, they noticed the depositions of David Morse and Ellis Freedman, two attorneys that Aboff testified had worked on his employment agreement on Macmillan's behalf. The debtors state that on the morning that Morse's deposition was scheduled to begin, they were informed that Morse had discovered an additional file in a remote record storage facility. These documents constituted Morse's working file for his representation of Aboff in these matters. The file included three pages of handwritten notes. They appear to be versions of the pages which Aboff earlier stated were his notes. The debtors assert that these documents remained untouched since late 1990 or early 1991.[11]
These later-produced notes (for ease of reference, the "Whitman notes") are decidedly different from the ones displayed at Aboff's deposition (the "Aboff notes"). The Whitman notes state "confirm I'm out of Max/Mac," without any reference to "politics." They also simply state "what happens after Cook is sold?", without any reference to a "return to Macmillan." In addition the Whitman notes say "continuing role in Max/Mac  0 [or the symbol for an ellipse]" without any reference to Aboff's availability for special projects.[12] In addition, the debtors have submitted an affidavit by a document expert who asserts that another page of Aboff's notes, Bates-stamped A000046, contained entries "1(F) Support OAG" and "6 available for Maxwell/Macmillan special assignments/projects" added at a time after the notes were originally taken. If the debtors are correct, the amendments certainly could be read to change the meaning entirely of what Aboff noted  from a likely cessation of any role with Macmillan to the establishment of a continuing role with Macmillan.
Faced with the Whitman notes and the document expert's affidavit, unsurprisingly Aboff admits that he amended his notes. He explains that it was his regular practice to amend and update his notes throughout the course of continuing negotiations such as those regarding his employment agreement. Aboff asserts that as his future role in the Maxwell organization was refined over the course of meetings, the notes were revised to reflect those developments.
The debtors attribute these changes not to amendments or clarifications of the earlier notations but to a deliberate strategy by Aboff to change what were admissions against interest into false evidence that would support his claims. They ask that I dismiss Aboff's claims outright under either of two theories: (1) Aboff's actions should be considered an admission of fact which entirely destroy his case; or (2) Aboff's actions *45 warrant dismissal as a sanction pursuant to my "inherent authority."
While the debtors have not addressed it, Federal Rule of Civil Procedure 37, made applicable to these proceedings via Fed. R.Bankr.P. 7037 could also be invoked as a grounding for the relief requested. That rule provides that a party who without substantial justification fails to make disclosure may be sanctioned by failure to use the withheld information at trial and/or other appropriate sanctions including attorney's fees. In addition to requiring payment of fees and expenses the court is permitted to utilize any of the sanctions contained in rule 37(b)(2), including dismissal of the offending party's claims.
The cases under Rule 37 provide guidance. Dismissal of an action under Rule 37 is a "drastic penalty which should be imposed only in extreme circumstances," Valentine v. Museum of Modern Art, 29 F.3d 47, 50 (2d Cir.1994), such as when the failure to comply is due to wilfulness, bad faith, or any fault on the part of the noncomplying party. See Société Internationale Pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095-96, 2 L.Ed.2d 1255 (1958). And, at least in this circuit, gross negligence in the performance of discovery obligations is sufficient "fault" to support imposition of the sanction of dismissal under the Rule. Cine Forty-Second Street Theatre v. Allied Artists, 602 F.2d 1062, 1067-68 (2d Cir.1979).
Sanctions, however, must be just under the circumstances. Bower v. Weisman, 674 F.Supp. 109, 112 (S.D.N.Y.1987); Wyle v. R.J. Reynolds Industries, 709 F.2d 585, 591 (9th Cir.1983). Thus courts have determined that, when necessary, the trial court may hold an evidentiary hearing on a motion for sanctions. Id. at 592. Indeed, the Ninth Circuit noted that an evidentiary hearing is often advisable in the sanctions context, since "that method best determines the appropriate sanctions while protecting a party's due process rights." Id. (citations omitted).
I noted earlier that I have not had the assistance of an evidentiary hearing to determine whether or not sanctions are appropriate under any theory. While I do not shy from sanctioning offending parties where appropriate, absent testimony in which credibility will be very much at issue, the record in this case is too ambiguous for me to dismiss Aboff's claims now, although I reserve the right to do so after an appropriate record is created.
Aboff has averred that it was his regular practice to update and amend notes during the course of discussions; he has submitted three supporting affidavits from those familiar with his practices attesting to that fact. In addition, while the debtors assert that the earliest involvement of the Whitman & Ransom firm was October, they attached a copy of a "cover memo" sent by Aboff to Ellis Freedman accompanying an exhibit purporting to be a draft employment contract prepared by the Aird & Berlis firm. See Brandon Affidavit, Exhibit E. This memo has a July date atop it, rendering it possible that the notes were sent prior to subsequent meetings between Aboff and Maxwell which, if they occurred as Aboff claims, clarified Aboff's role in the organization and resulted in later amendments. Similarly, as I noted above, the fax "telltales" of the Whitman firm seem to indicate that the firm's involvement began earlier than August. Absent testimony that might clarify these discrepancies, it would be inappropriate for me to dismiss Aboff's claims on tampering grounds.
In much the same vein, the allegedly false deposition testimony is vague. Aboff was shown his notes and questioned as follows:
Q: Is all of the handwriting on these four pages yours, Mr. Aboff?
A: Yes, I believe it is.
Q: Do you recognize these notes as being anything in particular?
A: Well, these are notes of a meeting or discussion I had with Kevin on March 27, 1990. At least the first two pages are. And it is possible that the third and fourth are as well.
Q: And by Kevin, you mean Kevin Maxwell?
A: Yes.
Q: And what was the subject of the meeting or discussion on March 27, 1990?

*46 A: I'm not certain of what else we might have discussed, but we certainly from these notes discussed my employment situation, my employment contract, et cetera.
Q: Are these notes that you made during the meeting or after the meeting or before the meeting?
MR EDLIN: If he can remember.
A: I believe (emphasis added) that these notes were made during the meeting.
Aboff Deposition Tr. at 313.
The debtors suggest that the testimony just quoted was carefully calculated to create the impression that all Aboff's notes were taken at the meeting on March 27. The debtors emphasize that, absent any solicitation by their counsel, Aboff pointed to his discussion with Kevin Maxwell on March 27 of those very portions of his notes which he now concedes were updated later. However, Aboff testified at another point in the transcript that he had had several meetings with Kevin Maxwell, Aboff Deposition Tr. at 228, so it is conceivable that Aboff may have inadvertently consolidated several meetings with Kevin Maxwell into one. The debtors also underscore that Aboff's testimony was to the effect that the notes he had provided them in discovery were the same as those in the possession of the Whitman firm. The relevant testimony follows:
Q: Did you give any documents to Whitman & Ransom?
A: Yes. Whitman & Ransom would have had as I recall, would have had the drafts, would have been the subject of discussions. They may have had some other notes. I can't recall exactly what documents I gave them, but I probably would have given them whatever was available at the time.
Id. at 347-348. This testimony is not what I could call damning, filled as it is with equivocation and speculation.
To be sure, I wonder about Aboff's veracity. But I have not heard him testify and there are sufficient discrepancies not only in his testimony but in the version of facts which the debtors paint that I cannot conclude with any degree of certainty that Aboff doctored the evidence and then lied about it. As I noted above, dismissal ordinarily requires showings of malice, bad faith, wilfulness, or, at a bare minimum, gross negligence. The ambiguities in the testimony and the disputes regarding the facts preclude me from determining on this summary judgment record that Aboff should suffer the severest of sanctions, dismissal of his claims. See Wyle, supra, 709 F.2d at 592 ("In the course of [evidentiary sanction] hearings, a court will make inferences and credibility determinations from evidence received. No sound basis exists to distinguish between hearing issues that go to the merits of the case and those that go only to the conduct of the parties.")
For essentially the same reasons, I will not now construe the allegedly false testimony or changes to the notes as admissions by Aboff. The Second Circuit's decision in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450 (2d Cir.1939), modified on other grounds, 103 F.2d 430 (2d Cir.1939), upon which the debtors place heavy reliance, does not compel a different result. In that case, the district court found against a ship owner who had falsified the ship's log in an attempt to demonstrate that it was not negligent in handling the ship's cargo. Judge Learned Hand, writing for the circuit court, found that "[t]he condition of the log and the unsatisfactory explanation of it, coupled with the testimony of those who freshly examined it, are enough . . ." Agreeing with the district court's findings of tampering, the appellate court noted that "[w]hen a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable conclusion is that he has something to conceal, and is conscious of guilt." Id. at 453. Thus, the court concluded that "[The act of tampering] goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well." See also U.S. ex rel. C.H. Benton, Inc. v. Roelof Construction Co., 418 F.2d 1328, 1331 (9th Cir.1969) (where evidence is tampered with, court draws presumption against the party who is responsible). Unlike the trial judge in Warner Barnes, however, I am without the benefit of testimony to adequately determine whether Aboff tampered with evidence or merely *47 amended his notes. This precludes granting the debtors the relief which they demand.
2. The Motions for Summary Judgment Regarding Claims Under the Employment Contract
Aboff has moved for summary judgment based upon the terms of the alleged employment contract with Macmillan or OAG, a document which the debtors urge is not admissible. As indicated earlier in this decision, the employment agreement tendered by Aboff is but a photocopy, neither side having seen in its files an original. The debtors challenge the authenticity of the photocopy, arguing that Aboff has failed to produce an employment agreement which satisfies the "best evidence" rule. It is they, they argue, who are therefore entitled to summary judgment.
To add weight to their contentions, the debtors have submitted an affidavit from a Price Waterhouse computer expert who opines that the document in question was created on the PH(US)I computer in February, 1991, and was modified by eleven keystrokes on December 4, 1991. Predicated on this opinion, the debtors raise the specter that Aboff may have edited the document on that latter date, printing it out on Macmillan letterhead. Aboff responds that eleven keystrokes are not very many and merely indicate that Aboff "scrolled" through the document on a word processor, reviewing it rather than altering it. He therefore argues that the presence of the eleven keystrokes should not lead to any inferences of tampering on his part.[13]
The "best evidence" rule, more correctly termed the "original writings" rule, is embodied in Article X of the Federal Rules of Evidence, rules 1001 through 1008 inclusive. The intellectual heart of the rule is embodied in Rule 1002, which provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Thus, the rule requires that parties that seek to prove what the contents of a writing are must produce the original writing unless a federal statute or another evidence rule affords them an exception. See Herzig v. Swift & Co., 146 F.2d 444, 445 (2d Cir.1945). The rationale behind the rule was noted by one commentator:
The rule was developed at common law to provide a guarantee against inaccuracy and fraud by insistence upon production at trial of original documents. Over time the scope of the rule was broadened to reflect modern reliance on mechanical and electronic recording devices and sophisticated methods of data compilation, storage, and retrieval, Rule 1001. The great expansion of pretrial discovery has measurably reduced the need for the rule.
B. Russell, Bankruptcy Evidence Manual, § 1001.0 (1994-95 ed.).
Rule 1001, which contains the necessary definitions, distinguishes between an "original" and a "duplicate," with the latter including a photocopy of an original. Rule 1003 allows a duplicate to be used in the same manner as an original except where a genuine question is raised as to the authenticity of the original or where in the circumstances it would be unfair to admit the duplicate in lieu of the original. Notwithstanding these rules, however, where an original is not available there are some circumstances in which secondary evidence may be offered to prove the contents of a writing. Specifically, Rule 1004 provides, so far as relevant, that such secondary evidence may be admitted if the original is lost or destroyed unless the proponent lost or destroyed the original in bad faith; if when the original was under the control of the party against whom offered that party was put on notice that the contents would be a subject of proof at the hearing and that party does not produce the original at the hearing; or if the writing for which the original is not produced is not closely related to a controlling issue.
Rule 1004 recognizes no degrees of secondary evidence. U.S. v. McGaughey, 977 F.2d 1067, 1071 (7th Cir.1993), cert. denied ___ U.S. ___, 113 S.Ct. 1817, 123 *48 L.Ed.2d 447 (1993). Therefore, depending on the circumstances present in a given case, evidence may qualify as a "duplicate original" under Rule 1003, thus meeting the "original writing" rule's requirements head on, or it may qualify as secondary evidence of the writing's contents under Rule 1004. See U.S. v. Gerhart, 538 F.2d 807, 810 n. 4 (8th Cir. 1976) (photocopy could have been admitted either as a duplicate, or as secondary evidence, in circumstances when original was lost, and there was no showing of bad faith); see also United States v. Taylor, 648 F.2d 565, 568 n. 3 (9th Cir.1981) (photocopies might also qualify as originals for purposes of best evidence rule where bank officer had made loan in reliance on photocopy rather than "original" typed letter).
But here the debtors do raise legitimate questions as to the authenticity of the photocopy. In other words, there is a genuine and indisputably material question of fact which it would be inappropriate to determine on summary judgment. Moreover, at trial, even if Aboff were unable to establish the authenticity of the proffered employment agreement or a photocopy thereof, he might be able to introduce admissible secondary evidence of the contents of the original. Accordingly, whereas I cannot grant summary judgment to Aboff, neither can I grant it to the debtors. See also 5 J. Weinstein, M. Berger, Weinstein's Evidence, ¶ 1001(1)[01] at 1001-14 (1994) ("[b]est evidence is a powerful tool that can preclude a case from being presented to the trier of fact. It should therefore be judiciously applied . . . when the reason proffered in support of exclusion of the evidence can readily be directed instead to the weight of the evidence.")
Having identified material issues of fact remaining for trial, it is unnecessary for me to discuss the parties' other arguments relating to the employment contract. Accordingly, both parties' motions for summary judgment on the contract claims are denied, pending a trial where I may properly determine whether or not (i) Aboff tampered with evidence, (ii) Aboff altered the employment agreement with or without the knowledge or assistance of Kevin Maxwell and (iii) the evidentiary threshold regarding the photocopied employment agreement has been met.[14]
3. Amendments Asserted After the Bar Date
The debtors contend that Aboff's amended proofs of claim asserts two new causes of action against the debtors that are time-barred, having been filed after the last date which I set for filing proofs of claim in each of the estates. There is no dispute that the amendments were filed after the bar dates. The issue is whether the amendments constitute new claims or instead relate back to the originally-filed proofs of claim.
Aboff initially sought damages for violations of New York Labor Law § 198 and for breach of his employment contract. Among the entitlements which he claimed was "Contractually Mandated Insurance . . . and other executive fringe benefits. . . ." Aboff amended his proof of claim to seek damages resulting from the debtors' alleged misrepresentations as to the availability of director and officer insurance coverage for costs incurred in defending investigations involving certain business transactions engaged in by the policyholders. The second amendment seeks a sum said to be due to him on account of liquidation of shares in his personal margin account at Advest, the same account into which the allegedly stolen Berlitz shares were deposited.
Congress intended the bar date in a Chapter 11 case to be a mechanism for providing the debtor and creditors with finality. Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.), 89 B.R. 358, 374 (Bankr. S.D.N.Y.1988), aff'd 99 B.R. 543 (S.D.N.Y. 1989), aff'd, 896 F.2d 1384 (2d Cir.1990); see also Associated Container Transportation (Australia) Ltd. v. Black & Geddes Inc. (In re Black & Geddes, Inc.), 58 B.R. 547, 553-54 (S.D.N.Y.1983). The bar order does not function as a "mere procedural gauntlet," but as an integral part of the reorganization process. *49 First Fidelity Bank, N.A. v. Hooker Investments, Inc. (In re Hooker Investments, Inc.), 937 F.2d 833, 840 (2d Cir.1991). Therefore, bar dates are likened to statutes of limitations which must be strictly observed. In re Brill, 52 F.2d 636 (S.D.N.Y.), aff'd per curiam, 52 F.2d 639 (2d Cir.1931) (Act case). And as I have observed before, "[a]lthough amendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely permitted, such amendments are not automatic but are allowed, `where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim.'" (citations omitted). In re W.T. Grant Co., 53 B.R. 417, 420 (Bankr. S.D.N.Y.1985) (Act case) (quoting Biscayne 21 Condominium Association, Inc. v. South Atlantic Financial Corp. (In re South Atlantic Financial Corp.), 767 F.2d 814, 819 (11th Cir.1985); see also In re McLean Industries, Inc., 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990). The short of it is that amendments may not be used merely to circumvent the bar date; they therefore must be carefully scrutinized to ensure that the amendment is truly amending the timely filed claim and not asserting an entirely new claim. In re Drexel Burnham Lambert Group Inc., 151 B.R. 684, 694 (Bankr.S.D.N.Y.1993); In re American International, Inc., 67 B.R. 79, 81 (N.D.Ill. 1986); In re Brown, 159 B.R. 710, 714 (Bankr.D.N.J.1993).
In deciding whether or not to allow an amendment to the proof of claim the court must first determine whether there was timely assertion of a similar claim evidencing an intention to hold the estate liable. Integrated Resources, Inc. v. Ameritrust Co. National Association (In re Integrated Resources, Inc.), 157 B.R. 66, 70 (S.D.N.Y.1993). If there was such an assertion, the court then balances the equities, looking to such factors as (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed. Id.
If a claim is "new" and therefore fails to relate back, all is not necessarily lost, however, because a late-filed claim may be permitted if the failure to file was the result of excusable neglect. See Nalco Chemical Co. v. LTV Steel Co. (In re Chateaugay Corp.), 1993 WL 127180, *6 (S.D.N.Y. Apr. 22, 1993); In re Brown, 159 B.R. 710, 715 & n. 4, 717-719 (Bankr.D.N.J.1993); see also In re Alexander's Inc., 176 B.R. 715, 719 (Bankr.S.D.N.Y.1995).[15] The party seeking to be relieved of the time bar bears the burden of demonstrating that its neglect was excusable. In re Nutri*Bevco, Inc., 117 B.R. 771, 786 (Bankr.S.D.N.Y.1990).
The Supreme Court has defined "neglect" to mean both faultless omissions to act and omission caused by carelessness. Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, ___ U.S. ___, ___, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 (1993). As the Court explained in Pioneer, the determination of what is excusable neglect is "at bottom an equitable one;" the Court endorsed a balancing of the following factors: "the danger of prejudice to the debtor, the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant and whether the movant acted in good faith." ___ U.S. at ___, 113 S.Ct. at 1498.
Here the original claim provided the debtors with notice that Aboff intended to hold the debtors liable for what he described as "Legal fees and costs covered by O & D insurance or company policy." Thus the debtors were on notice that Aboff sought to hold them liable for the alleged contractually-mandated legal fees and costs; the amended claim seeks the same recovery under a different *50 theory, namely, that the debtors refused to provide and misrepresented to Aboff that there was such coverage to which he believes he was entitled under his contract. It is the same legal fees and costs which Aboff seeks to recover on both theories. Given that the recoveries sought are the same, there is no prejudice to the creditor body. Nor has there been any showing of bad faith by Aboff in the interposition of the amendment.[16] The only factor which tilts in the debtors' favor is that Aboff has failed to explain why he did not assert his alternative theory initially. However, the equities tip here in favor of Aboff. Accordingly, I will allow the amendment much as did the court in Integrated Resources, 157 B.R. 66, which permitted claimants who had asserted their right to recovery under certain guarantee agreements to amend to assert a claim against the debtor for fraudulently inducing them to enter into the agreements.
The amendment seeking damages arising out of the margin call on the Advest account suffers a different fate, however. Aboff has not even attempted to justify his failure to timely file this claim. See In re Black & Geddes, Inc., 58 B.R. at 554 (while not dispositive, the failure to assert an excuse for the late claim is one factor to consider in determining the relative equities). Aboff also failed to offer any explanation as to why this amendment should be allowed either on a relation-back theory or under the doctrine of excusable neglect. (Actually, Aboff never even mentioned excusable neglect in his submissions to the court.) I can discern no relationship whatsoever between his original proof of claim and this new claim. Therefore, this amendment is dismissed as time-barred.
B. The Debtors' Counterclaims
1. Standing
Aboff contends that the Realization Trust lacks standing to assert the debtors' counterclaims against Aboff. This trust was created in Macmillan's confirmed plan of reorganization pursuant to section 1123(b)(3)(B) of the Code expressly for the purpose of prosecuting the debtor's claims for the benefit of certain classes of its creditors. (The Maxwell Macmillan Realization Liquidating Trust Agreement, art. 4, § 6.1  "The Holders of the Allowed Class 3D and Class 3E Claims shall hold 100% of the beneficial interests in the Realization Trust"). Nevertheless, Aboff argues that the Realization Trust lacks standing to assert the counterclaims because, he says, these claims for breach of fiduciary duty and conversion belong not to the debtors, but to the creditors. For this proposition he relies on the rule that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Shearson, Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir.1991). As Shearson explained, the critical inquiry in determining the debtor in possession's standing is whether the claims asserted could have been asserted by the debtor just before the bankruptcy. Id. at 119. If the facts are such that the wrongdoing of management must be imputed to the debtor, this will defeat the trustee's ability to recover, leaving only the creditors with a remedy.
In Shearson, the debtor's bankruptcy trustee, who had sued on a variety of contract and tort claims, alleged that the defendant brokerage house aided and abetted the debtor's sole stockholder and decisionmaker in making bad trades that dissipated corporate funds. The circuit court noted that the debtor's sole stockholder actively participated in the bad trades and that the brokerage house owed no fiduciary obligation to the debtor other than to execute its trades. Id. at 120. Thus, the sole stockholder's wrongdoing was imputed to the debtor, defeating the trustee's standing. In Shearson, the principal was acting to the potential benefit of the corporation (if the trades had not been sour ones); stated differently, he had not wholly abandoned the corporation's interests.
The law recognizes a distinction between fraud on behalf of a corporation and *51 fraud against it. See Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449 (7th Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); accord FDIC v. Shrader & York, 991 F.2d 216, 224 (5th Cir.1993); In re Crazy Eddie Securities Litigation, 802 F.Supp. 804, 817 (E.D.N.Y.1992). In Cenco, the Seventh Circuit explained that
[f]raud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not the only victims. . . . But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud . . . [t]he primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud . . .
686 F.2d at 456.
Bear in mind that the suit in Shearson was against a third party who owed no fiduciary obligation to the debtor. Here, it is Aboff's view that he was part of executive management of Macmillan (in fact, he notes that his stationery listed him as a group vice president of Macmillan and that he was identified as executive management on various corporate charts) contrary to what the debtors have contended. If Aboff is correct, then he would have owed certain fiduciary obligations to Macmillan, clearly distinguishing this case from Shearson on at least two grounds, first, that Aboff could not be considered a third party and, second, that Aboff was a fiduciary to Macmillan. Under those circumstances, Macmillan could have stated a claim against Aboff for his alleged wrongdoing, for plainly a corporation can sue its insiders for their derelictions vis-à-vis the corporation. In addition, it is certainly conceivable that the alleged theft or conversion of Macmillan's assets was a fraud committed not on behalf of but against Macmillan. If the facts are as alleged by Macmillan, then the wrongdoing by Aboff and the Maxwells would in all likelihood not be imputed to Macmillan. See Mirror Group Newspapers, plc v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.), 164 B.R. 858 (Bankr.S.D.N.Y. 1994), aff'd without opinion, No. 94 Civ. 2711 (S.D.N.Y. June 14, 1994).[17]
The bottom line is that inasmuch as the salient facts are very much in dispute, I cannot grant summary judgment to Aboff on the grounds that the Realization Trust lacks standing to pursue the claims arising out of the alleged theft or conversion of Macmillan's assets.
2. Remand of the Berlitz-related counterclaims
Having initially requested remand of the Berlitz-related counterclaims, to which remand the debtors consent, Aboff now argues that he is entitled to dismissal of all the counterclaims for the reasons discussed earlier, or, in the alternative, to mandatory abstention. As I have already denied him summary judgment dismissing the counterclaims, I believe that remand is the most appropriate course to pursue.
Last year I abstained from the state court action entitled Berlitz International, Inc. v. Macmillan, pursuant to the mandatory abstention provisions of 28 U.S.C. § 1334(c)(2). That action had been removed to the District Court and automatically referred to me. At the time that I remanded that suit, Advest had prepared an interpleader complaint with respect to the proceeds of the Berlitz shares held in Aboff's account. However, in light of the automatic stay which arose upon the filing of Macmillan's bankruptcy petition, Advest had been unable to file the interpleader complaint. (At that time, there was a dispute as to whether or not Aboff did, in fact, *52 hold a beneficial interest in the account.[18]) Subsequent to the remand, Advest commenced the interpleader to determine to whom to deliver the proceeds in Aboff's account. Obviously, what the debtors allege in their counterclaims here is very much at issue in the remanded state court action.
Mandatory abstention over the Berlitz-related counterclaims probably is not appropriate because that doctrine only has currency with respect to non-core actions. See Eastern Air Lines, Inc. v. International Assoc. of Machinists & Aerospace Workers AFL-CIO (In re Ionosphere Clubs, Inc.), 108 B.R. 951, 954 (Bankr.S.D.N.Y.1989). The Berlitz counterclaims under a literal reading of 28 U.S.C. § 157(b)(2)(C) are core.[19] However, I deem it proper to remand the Berlitz-related counterclaims to state court under the discretionary abstention provisions of 28 U.S.C. § 1334(c)(1). That provision states:
(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11. 28 U.S.C. sec. 1334(c)(1).
As the Second Circuit has stated, "[t]he statute thus furnishes three admittedly nebulous criteria to determine whether abstention is appropriate." Coker v. Pan American World Airways, Inc. (In re Pan American Corp.), 950 F.2d 839, 845 (2d Cir.1991). While the criteria remain nebulous, we know this provision was intended to codify the judicial abstention doctrine. Id. Courts have examined a number of factors in determining whether abstention is appropriate under that doctrine:
(1) the effect or lack thereof on the efficient administration of the estate if the court recommends abstention, (2) the extent to which state law issues predominated over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the judicial basis, if any, other than 28 U.S.C. sec. 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.
Couri v. Fisher (In re JCC Capital), 147 B.R. 349, 354 (Bankr.S.D.N.Y.1992); In re Ionosphere Clubs, Inc., 108 B.R. at 954 (quoting Republic Reader's Service, Inc. v. Magazine Service Bureau, Inc. (In re Republic Reader's Service, Inc.), 81 B.R. 422, 429 (Bankr.S.D.Tex.1987)); see also In re Pan American Corp., 950 F.2d at 846 (citing with approval use of factors in making discretionary abstention determination).
There is no talisman for weighing these factors, but in the instant case they militate heavily in favor of discretionary abstention. The counterclaims rest entirely on New York law and the underlying litigation between the Macmillan, Aboff and Advest is already in state court. Bankruptcy law has little or no relevance to the claims and they are easily severable from the core bankruptcy matters. As noted, the debtors have consented to remand of their counterclaims. Finally, pursuing these claims in state court along with similar other claims relating to the Berlitz *53 shares offers a more efficient use of the estate's resources.
Having determined to remand the Berlitzrelated counterclaims, I see no reason to impinge on the prerogative of the state judge by addressing any other issues related to them.[20]
3. The Statute of Limitations
I am left with Aboff's argument that the statute of limitations bars the assertion of the counterclaims. It is impossible to deal with this issue now because of the multiple disagreements in the factual context, including the dates of the alleged conversions. (To the extent that the counterclaims are to be determined in the state court action, the limitations issue is one for the state judge in any event.) But even if an affirmative recovery by the debtors is time-barred, defensive use of the counterclaims may be permissible if they can be said to be more in the nature of recoupment than of setoff. See 51 Am. Jur.2d, Limitation of Actions § 76 at 655; 3 J. Moore, Moore's Federal Practice at ¶ 13.11 (2d ed. 1995); Stone v. White, 301 U.S. 532, 539, 57 S.Ct. 851, 854-55, 81 L.Ed. 1265 (1937); see also Basham v. Finance America Corp., 583 F.2d 918, 927 n. 16 (7th Cir.1978).
SETTLE ORDER consistent with this opinion.
NOTES
[1] Aboff's motion was styled as one for partial summary judgment. However, he has now withdrawn two claims and modified another such that he now seeks judgment on all his remaining claims.
[2] In actuality, the Macmillan counterclaims are asserted by a liquidating trust which was vested pursuant to that debtor's confirmed plan of reorganization with the right to pursue claims on behalf of the estate.
[3] At oral argument Aboff withdrew certain of his claims which will therefore not be discussed.
[4] Aboff also contends that he is entitled to an undetermined amount of interest on this sum.
[5] Aboff has produced no proof for either of these claims.
[6] This is asserted to be the minimum that the debtors owe.
[7] The claim's reference to the accounting firm is cryptic. Presumably, Aboff is referring to one of the Maxwell entities such as Headington, whose administrator is a member of Arthur Anderson & Co.
[8] Although both estates are named as plaintiffs in the adversary proceeding instituted in response to Aboff's proofs of claim, the pleading makes no mention of OAG other than in the caption and various demands for relief. No identifiable harm to OAG is alleged. Nor do the papers submitted on these motions elucidate what claims OAG has against Aboff. Accordingly, I can only conclude that OAG has no counterclaim against Aboff and that summary judgment should therefore be granted against it.
[9] The debtors note that Aboff also consulted with a Canadian law firm, Aird & Berlis, in drafting his employment agreement. They accuse Aboff of failing to disclose that fact during his deposition when they inquired with whom he consulted regarding a draft employment agreement.
[10] Directly before this statement is a mark that the debtors contend is a zero, while Aboff states it is an "ellipse," meaning that it is an "open set," his shorthand for an open question. The significance of this dispute is discussed further below.
[11] There is some dispute as to when the Whitman firm commenced working for Aboff. The debtors assert that the earliest involvement was a phone conference between Messrs. Freedman and Morse on August 21, 1990, with an actual meeting between Aboff and Morse on October 2, 1990. Accordingly, the debtors claim that the notes remained unaltered for at least seven months. Aboff, however, claims that his contact with the Whitman firm was in June, and has produced several draft documents whose fax "telltales" indicate that the Whitman firm accepted transmittal at an earlier date than that ascribed to them by the debtors.
[12] Whether the mark is a zero or an ellipse, review of the Whitman and Aboff notes shows that the mark was left open at the top and filled in at a later time.
[13] In addition, the debtors question the actual date of the alleged employment agreement's execution and attack the affidavit of Kevin Maxwell under hearsay and other procedural grounds.
[14] In addition, of course, if the employment agreement is admissible, I will have to determine what it means. Its language is far from unambiguous.
[15] Rule 9006(b) provides in relevant part:

[W]hen an act is required or allowed to be done at or within a specified period . . . the court for cause shown may at any time in its discretion . . . permit the act to be done where the failure to act was the result of excusable neglect.
[16] This is not to say that I have forgotten the debtors' contention that Aboff tampered with the central evidence supporting his original claims. If their contention be correct, Aboff will be sanctioned appropriately, possibly through dismissal of all his claims, whether original or amended.
[17] Aboff claims that a decision of the High Court in London in which Macmillan unsuccessfully sued brokerage houses and banks which received some of the Berlitz shares establishes that the Maxwells were acting for their own benefit. Although Aboff asserted collateral estoppel in his answer, he did not argue on this motion how it would operate to insulate him from suit. That his name may not have surfaced in Macmillan's suit against third party banks and brokerage houses is neither here nor there. Regardless of the effect of the English judgment, it is plain that the parties disagree with respect to Aboff's role at Macmillan which is certainly central to resolution of the standing issue.
[18] Given the time-barred amendment which Aboff sought to assert arising out of the liquidation of the securities in his account with Advest, it may still be that he is contending that he had some beneficial interest in the securities in that account. Frankly, I can't make head or tail out of his submissions on that point.
[19] It is arguable that a permissive counterclaim to a proof of claim would not be core. Because I believe that discretionary abstention is appropriate, it is unnecessary to delve into the issue of whether the counterclaims are core such that mandatory abstention is implicated.
[20] I am assuming that neither party wishes me to abstain from the counterclaims to the extent that they allege diversions of assets other than the Berlitz shares. Given that the counterclaims plead all the diversions together, however, it is possible that the parties intend for the counterclaims, in their entirety, to be remanded. I will take up this matter with the parties when an order is settled following this opinion. If they are unable to agree on what is to be remanded, they are directed to schedule a conference with me to resolve this one issue.