**In re Jack V. OAKLEY and Saranne D. Oakley, Debtors.**

**Elizabeth H. Doucet, et al., Plaintiffs,**

**v.**

**Drydock Coal Company, et al., Defendants.**

**Bankruptcy No. 03–59297.**
**Adversary No. 05–2289.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Nov. 22, 2008.

Elizabeth H. Doucet, Lake Charles, LA, pro se.

Kenneth M. Richards, William B. Logan, Jr., Columbus, OH, for Plaintiffs.

Justin W. Ristau, Kenneth C. Johnson, Bricker & Eckler LLP, Columbus, OH, James E. Nobile, Nobile & Thompson Co., L.P.A., Hilliard, OH, for Defendants.

David C. Morrison, pro se.

Chris Gerig, pro se.

Paul Gerig, pro se.

*MEMORANDUM OPINION ON COMPLAINT FOR DECLARATORY JUDGMENT (DOC. 1) AND ON DEFENDANTS' COUNTERCLAIMS FOR DECLARATORY JUDGMENT (DOC. 42)*

CHARLES M. CALDWELL,
Bankruptcy Judge.

## I. Introduction

Tangible items, including documents in paper form, are susceptible to loss or destruction. When the document is a written contract committed only to paper and as a result of its loss or destruction no original or reliable duplicate remains, the parties' rights could be at risk. If litigation ensues, the party with potentially-jeopardized rights will introduce secondary evidence of the contract's existence and terms. The party on the other side of the litigation may attack the reliability of the evidence, arguing that it proves nothing more than convenient memory and self-interest. Such an attack is especially likely when the skeptical litigant was neither a party to the contract nor a witness to it, leaving the party without independent knowledge of its terms.

The scenario described above is before the Court in this adversary proceeding. Each side seeks a declaratory judgment regarding the efficacy of a purported contract—a written version of which the parties have been unable to produce—that the Defendants allege voids a pledge of stock Jack V. Oakley ("Debtor")[1] made to one of the Plaintiffs.

1. On June 20, 2003 ("Petition Date"), the Debtor and his spouse, Saranne Oakley—who is not a party to this adversary proceeding—filed a joint voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By an order entered on the docket in the Debtor's bankruptcy case on May 17, 2004 (Doc. 75), the Court, upon the request of Citizens Bank of Logan, converted the Chapter 11 case to a case under Chapter 7, and ordered the appointment of a Chapter 7 trustee, resulting in the appointment of Elizabeth H. Doucet ("Trustee") in that capacity.

The Court finds that the Defendants have the burden of proving the material terms of the contract and have failed to carry this burden. Furthermore, the Court concludes that the stock is property of the Debtor's bankruptcy estate under 11 U.S.C. § 541. The Court, therefore, will grant declaratory judgment in favor of the Plaintiffs on Count I and Count II of their Complaint and deny the declaratory judgment requested by the Defendants.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052).

## II. Jurisdiction

The Court has jurisdiction to determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O). *See also* District Court Order dated March 6, 2007 (Doc. 61) at 3–4 ("[F]undamentally the case is about who gets property (the shares of Drydock stock) that is part of the Debtor's estate. This issue will be governed by the Bankruptcy Code. The bankruptcy court is certainly capable of resolving the contract issue presented by the complaint. That the adversary proceeding is predominantly core favors denying the motion to withdraw [the reference].").

## III. Findings of Fact

Having considered the pleadings, the arguments and representations of counsel, the testimony, the exhibits admitted into evidence and the other evidence adduced at the trial, the Court makes the following findings of fact:

### A. Drydock Coal Company and the Jack V. Oakley Trust

The Debtor is a defendant both as a shareholder of Drydock Coal Company ("Drydock") and in his former role as the successor trustee of the Jack V. Oakley Trust ("Trust"). Founded in 1940 by ancestors of the Oakleys, Drydock is an Ohio for-profit corporation that once operated a coal mining business but no longer does so and now attempts to market underground mineral interests to third parties. The Debtor acquired 100 shares of Drydock from his father in 1979. On May 14, 1981, the Debtor executed a trust agreement, and the Trust then held the 100 shares. The Debtor's father died, and, later in 1981, the Debtor acquired his father's additional shares in Drydock through the probate process. The Trust held those shares as well. In transactions described in further detail below, the Debtor transferred shares in Drydock to his sons (Mark, Gregg, Timothy and John, who also are defendants), and shares were acquired by Margaret Galvin, a long-time Drydock secretary and relative of the Oakley family by marriage. Moreover, prior to the Petition Date, the Debtor revoked the Trust. As of the Petition Date, therefore, Drydock's shareholders were the Debtor, his four sons and Defendant Margaret Galvin. The Debtor owned the controlling interest, approximately 54% of the shares in Drydock.

### B. The Loan Transaction with Citizens Bank of Logan

In April 2000, the Debtor pledged the Trust's 337.5 shares of stock in Drydock ("Pledged Stock") to the other Plaintiff in this adversary proceeding, Citizens Bank of Logan ("Citizens"). Together with certain real estate, the Pledged Stock was collateral for a $1 million loan the Debtor obtained as funding for a golf course development. At the time he made the pledge, the Debtor stated in an affidavit as follows: "I have authority under the [agreement governing the Trust] to pledge the subject stock as collateral for loan purposes and

have, by separate instruments so elected to pledge said common stock to the Citizens Bank of Logan."

Citizens has had possession of the stock certificate representing the Pledged Stock since April 2000. Stamped on each Drydock stock certificate, including the one held by Citizens, is the following legend:

The shares of stock represented by this certificate are subject to an agreement dated October 20, 1981, a copy of which [Drydock] will mail to the holder of this certificate without charge within five (5) days of receipt of a written request therefor and said shares may not be sold, transferred, assigned, pledged, hypothecated, or otherwise disposed of, except in strict accordance with the terms of that agreement.

### C. The 1981 Transactions

Prior to the transaction with Citizens, on October 20, 1981—the date referenced in the Pledged Stock legend—the Debtor and his four sons had entered into a purchase agreement for a portion of the Debtor's stock in Drydock ("Purchase Agreement") at a price of $400 per share.[2] The Purchase Agreement, therefore, conceivably could be the "agreement dated October 20, 1981[.]" The Purchase Agreement, however, includes no restriction on the pledge or other transfer of Drydock stock. The Defendants, therefore, point to another contract—the so-called Mandatory Buy–Sell Agreement allegedly dated October 20, 1981 and amended on December 24, 1981 ("1981 Agreement"). In connection with

the purchase transaction, the Debtor retained certain stock for himself, which later became the Pledged Stock. The four sons contend that the 1981 Agreement prohibited the Debtor from transferring the Pledged Stock during his lifetime and now gives them the right to purchase the Pledged Stock for $400 per share (for a total of $135,000), the price purportedly established by the 1981 Agreement.

### D. The Adversary Proceeding

Unfortunately, no one can locate the original or even a duplicate of the 1981 Agreement. As a result, this litigation ensued. On June 10, 2005, Citizens and the Trustee commenced this adversary proceeding by filing a complaint for declaratory judgment and avoidance of fraudulent conveyances, with the Plaintiffs originally bringing eight counts. Under Counts I and II, the Plaintiffs seek an order declaring the 1981 Agreement to be of no effect with respect to the Pledged Stock. Under Counts III through VI, the Plaintiffs initially sought an order avoiding as a fraudulent conveyance a restatement of the 1981 Agreement dated April 10, 2003 ("2003 Document"), but have since dismissed those counts by stipulation. *See* Doc. 98, Stipulations Relating to Dismissal of Various Claims, Use of Deposition Transcript at Trial, and Order of Witness Presentation ("Stipulations"). Under Count VII, Citizens sought an order declaring that it has a valid security interest in the Pledged Stock; Citizens and the Trustee have since resolved this count and it too was dismissed.[3] The Trustee settled

---

**2.** The price of $400 per share was equivalent to the per-share valuation made for estate tax purposes.

**3.** The Plaintiffs have agreed on two alternative outcomes of this litigation. If they prevail, then the Debtor's estate will be entitled to 20% and Citizens 80% of the proceeds that the Trustee is able to realize from disposition

of the Pledged Stock. If the Defendants prevail, then the Plaintiffs will share equally in the proceeds of the $135,000 amount that the Defendants would be required to pay to redeem the Pledged Stock.

Count VIII, which requested an order providing that the Trustee is entitled to certain corporate information as a shareholder of Drydock. Accordingly, all that remains of the Complaint is Counts I and II for a declaratory judgment regarding the 1981 Agreement.

On August 17, 2005, the Defendants filed an amended answer and counterclaim. In Count I of the counterclaim, the Defendants seek an order declaring that the 1981 Agreement is valid and restricts the transfer of the Pledged Stock. By Counts II, III, IV and V of the counterclaim, the Defendants seek an order declaring that Citizens's security interest in the Pledged Stock is void and that the Defendants now have the right to purchase the shares at the price of $400 per share. The parties agreed to dismiss Count II of the counterclaim and through the Stipulations further framed the other counts of the counterclaim. In particular, the parties have agreed that, if the Defendants prove the existence and terms of the 1981 Agreement, then the Defendants would be entitled to purchase the Pledged Stock for the price of $135,000 but that, if the Defendants do not carry their burden of proof, then the Pledged Stock is not subject to any transfer restriction. In other words, all of the remaining causes of action in both the complaint and the counterclaim seek declaratory judgments regarding the existence and efficacy of the 1981 Agreement and the parties' rights to the Pledged Stock.

The Court held numerous pre-trial conferences earlier in the proceeding, followed by five days of trial on February 15 and 19–22, 2008. Post-trial briefing concluded on May 16, 2008. Prior to that time, on April 9, 2008, the Debtor filed a motion (Doc. 122) seeking to dismiss the adversary proceeding for lack of jurisdiction and standing. On October 22, 2008, the Court entered an order (Doc. 137) denying the Debtor's motion to dismiss.

### E. The Defendants' Secondary Evidence

During the trial, the Defendants propounded secondary evidence of the 1981 Agreement's existence and terms, including, among other evidence, the following: (i) testimony by each individual party that their intent in entering into the 1981 Agreement was to restrict the pledge or other transfer of the stock given that Drydock is a closely-held family corporation in which they wanted no interest to be held by anyone who was not a family member; (ii) testimony by the parties regarding the signing of the 1981 Agreement, the existence of the 1981 Agreement and the agreement's terms; (iii) testimony that one of the sons, Gregg, used a form book to draft the 1981 Agreement; (iv) copies of pages from the actual form book allegedly used in drafting the 1981 Agreement, with handwritten notations in the margins of the particular forms used to draft the 1981 Agreement; (v) the legend on the Pledged Stock certificate; (vi) references to the 1981 Agreement in documents that existed before the Debtor pledged the Pledged Stock to Citizens;[4] (vii) the 2003 Docu-

---

4. One of these documents is a letter dated February 3, 1994 from one of the sons and Defendants, Mark Oakley, to his attorney, Robin Hoke. In the letter, Mark Oakley stated in part as follows: "All of the Drydock shares are subject to a Buy–Sell Agreement. So that Drydock has the cash to exercise its rights thereunder to purchase the [shares of Dry-

dock held in the Debtor's revocable trust], *it owns and pays the premiums on a life insurance policy on [the Debtor], face amount $250, 000, the stated purchase price for the trust shares.* The trust terminates on [the Debtor's] death, and any assets of the trust go to the four sons, subject to this option of Drydock to in effect substitute cash for the shares." (em-

ment, which the Defendants prepared with the assistance of attorney David Morrison more than twenty years after the alleged entry into the 1981 Agreement and approximately three years after the Debtor pledged the Pledged Stock to Citizens; and (viii) the testimony of Mr. Morrison.

The Defendants have expressly stated that they are not relying directly on the 2003 Document in support of their rights with respect to the Pledged Stock. (*See* Stipulations at paragraph 1.) Rather, they are relying directly on the 1981 Agreement. In their view, the effect of the 2003 Document is that it is secondary evidence of the existence and terms of the 1981 Agreement. Based on the 2003 Document and the other secondary evidence presented at trial, the Defendants contend that the Debtor's pledge of the Pledged Stock violated a provision of the 1981 Agreement substantially similar to the following: "[n]o shareholder shall transfer or encumber his shares of capital stock of the Corporation to any person, firm, or corporation, during his or her lifetime." The Defendants contend that this provision was taken from a form of Mandatory Buy–Sell Agreement contained in § 11.40 of the 1981 Ohio Transaction Guide, entitled "Stock Redemption Agreement." The Defendants also contend that the 1981 Agreement included the following provision, making the pledge void and giving them the right to purchase the Pledged Stock for $400 a share:

> Each shareholder agrees that he will not transfer, assign, hypothecate, or in any way alienate any of his shares, or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, unless in a transfer which

meets the requirements of this Agreement. Any purported transfer in violation of any provision of this Agreement shall be void and ineffectual, shall not operate to transfer any interest or title in the purported transferee, and shall give the corporation and the shareholders an option to purchase such shares in the manner and on the terms and conditions provided for herein.

Unlike most of the provisions of the 1981 Agreement, the provision quoted above allegedly was taken from a form of Option Agreement contained in a different section of the Ohio Transaction Guide, § 11. 50, entitled "Agreement Among the Shareholders and the Corporation Restricting the Transfer of Shares with Corporation Having First Option." The Defendants contend that these provisions prohibited the Debtor from pledging the Pledged Stock to Citizens and made the pledge void, so that Citizens obtained no interest in the Pledged Stock. The 1981 Agreement also purportedly gave the four sons the right to purchase the Pledged Stock for $400 per share (for a total of $135,000).

### F. The Plaintiffs' Response

In response, the Plaintiffs do not assert fraud or bad faith on the part of the Defendants; rather, they allege a "circling of the wagons" and faulty memories of remote events. The Plaintiffs do not attempt to prevent the Defendants from introducing secondary evidence; rather, they argue that the secondary evidence introduced by the Defendants fails to prove the existence or material terms of the 1981 Agreement.

phasis added). Another document is the April 1984 last will and testament of Mark Oakley, in which he directed that his executors "comply with the provisions of a certain buy-sell agreement executed October 20, 1981 by and

among myself, my brothers, and said Drydock Coal Company concerning said shares ..." The will failed to reference the Debtor's and the Trust's alleged status as parties to the 1981 Agreement.

In an effort to call the Defendants' evidence into question, the Plaintiffs point to, among others, the following facts and circumstances: (i) the Debtor pledged the Pledged Stock and signed a notarized affidavit representing to Citizens that he had the authority to pledge; (ii) the Defendants conceded in the 2003 Document that they "cannot precisely remember [the 1981 Agreement's] exact terms" and that they desire to honor their commitments thereunder "whatever those commitments might have been, as nearly as possible[;]" (iii) Greg Oakley, who allegedly was primarily responsible for drafting the 1981 Agreement, testified that he did not have any direct recollection of drafting it until after seeing a form book that he allegedly used to draft the agreement by making notations in the form book and giving it to a secretary to type; (iv) the Defendants have found and produced other documents that the Debtor and his sons signed on October 21, 1981 in connection with the purchase of Drydock stock, including the Purchase Agreement, but nonetheless have been unable to produce the 1981 Agreement; (v) by their own admission, none of the Defendants ever consulted or even saw the 1981 Agreement after its alleged signing; (vi) in December 1981, Margaret A. Galvin received shares of Drydock stock in a transfer that would have been in violation of the 1981 Agreement (if it existed) were it not for a purported amendment to the 1981 Agreement dated December 24, 1981, which the Defendants also have been unable to locate; (vii) in his will, Mark Oakley identified his brothers and Drydock as parties to the 1981 Agreement but did not identify the Debtor or the Trust, suggesting that any transfer restriction applied only to the four sons; (viii) in a letter to one of his attorneys, Robin Hoke, Mark Oakley stated that the purchase price for the shares owned by the Trust (*i.e.*, the Pledged Stock) was the face amount on the life insurance policy on their father, $250,000 (in contrast to the $135,000 amount asserted by the Defendants); and (ix) an amendment to the Trust made after the 1981 Agreement purportedly was entered into provided for the disposition of the Drydock stock upon the death of the Debtor in a manner that would have violated the 1981 Agreement (*e.g.*, a transfer to Saranne Oakley, who was not a shareholder or a party to the alleged 1981 Agreement) but the amendment did not refer to the 1981 Agreement or require Ms. Oakley to transfer the shares to Drydock.

## IV. Legal Analysis

The parties introduced extensive testimony, submitted voluminous exhibits and filed lengthy briefs. Their dispute, however, revolves around these related questions: First, does the 1981 Agreement exist? Second, if it does, was the Debtor's pledge of the Pledged Stock prohibited by the agreement's terms and does the agreement now give the other Drydock shareholders the right to purchase the shares for a purchase price of $400 per share? In addition, the adversary proceeding presents the issue of whether the Pledged Stock is property of the Debtor's bankruptcy estate.

### A. Existence of the 1981 Agreement

■ The Plaintiffs dispute the existence of the 1981 Agreement or any agreement prohibiting the Debtor from pledging the Pledged Stock to Citizens. " 'It is black letter law that the burden of proving the existence ... of a contract rests on the party seeking to enforce it.' " *Woodman Design Group Inc. v. Homesteads of Newtown, LLC*, 2003 WL 22272596 at *2 (D.Conn. Sept.30, 2003) (quoting *Brock Equities Ltd. v. Josephthal, Lyon & Ross, Inc.*, 1995 WL 380097 at * 11 (S.D.N.Y. June 27, 1995)). Here, the Defendants

seek to enforce the transfer restriction purportedly present in the 1981 Agreement. The Defendants, therefore, carry the burden of proving the agreement's existence.[5]

■ What does it mean to say that a contract "exists"? At trial, Citizens intimated that the Defendants intended to enter into a buy-sell agreement restricting the transfer of the Pledged Stock but failed to commit their agreement to writing, with the result being that the agreement does not exist. (*See* Transcript at 855:18–20, in which counsel for Citizens states: "From the time that I got involved in this and, and saw documents I kept saying, 'Guys, these people intended to do an agreement, but they never did[,]' " and Transcript at 857:12–17, in which the Trustee states as follows: "I don't think the [Defendant's] testimony is powerful in proving the existence of the 1981 Agreement. It's powerful with regard to how these people feel about Drydock and it's powerful as to their intent, but it, it doesn't go to the fact that they created a document. Somehow it did not get created.")

■ This represents an incorrect understanding of the law. It is precisely the Defendants' "intent," the meeting of their minds, not a writing, that matters. Citizens has pointed to no applicable statute-of-frauds provision or other authority that requires a restriction on the transfer of stock to be in writing in order for it to be effective among the parties.[6] Moreover, unless there is evidence that the parties' intent was that their agreement would not be binding until it was committed to writing, contract formation occurs even if the agreement is never reduced to writing. *See Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410, 413 (1978) ("Although it is well-established that courts will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both … in the cause sub judice there is no evidence of such intent.") (citations omitted); *Charvat v. Oasis Mortgage, Inc.*,

**5.** Some courts have held that the proponent must prove the existence and terms of an allegedly lost contract by clear and convincing evidence; others have required proof only by a preponderance of the evidence. The parties agree that Ohio law controls the issue; the Ohio Supreme Court, though, has not weighed in on the split. In *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 688 (6th Cir.2000), however, the Sixth Circuit upheld the district court's use of the preponderance of the evidence standard as the proponent's burden of proof under Ohio law. "[A] preponderance of the evidence standard should be used to determine whether [the proponent] had carried its burden. … [This] standard … makes practical sense, appears to represent the majority rule, and can be said to reasonably anticipate the Ohio Supreme Court's position." *Id.* Although *Lincoln Elec.* "is not mandatory authority" because "[i]t is a federal … opinion predicting what the … state supreme court would do,

not an authoritative interpretation from a state court[,]" *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 169 n. 2 (4th Cir.2002), the Court finds it persuasive. The Court need not decide the burden of proof issue, however, because the Defendants have failed to carry their burden even under the lower preponderance of the evidence standard.

**6.** Section 1701.25(B) of the Ohio Revised Code makes restrictions on the transfer of certificated securities unenforceable against a *transferee* of the shares unless the certificate contains a legend complying with the statute, which requires a statement of the terms of such restriction, a summary of the terms of the restriction or a reference to a written agreement containing the restriction. The parties did not address whether the legend on the Pledged Stock complied with § 1701.25(B). Given the Court's decision on the other issues, the Court need not address the issue.

2003 WL 21291046 at *2 (Ohio App. June 5, 2003) ("Where the terms of a contract have in all respects been definitely understood and agreed upon, the failure subsequently to embody such terms in a written contract, as agreed, does not prevent the contract, where no statutory objection interposes, from being obligatory upon the parties ... in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed.").[7]

▮ Unless a writing is required, when we say that a contract "exists," we mean only that the parties have met the requirements for the formation of a contract. *See Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 2007 WL 114497 at *16 (S.D.Tex. Jan.10, 2007) ("Whether a contract exists depends on whether the requirements for contract formation are met."). Under Ohio law, the "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Minster Farmers Coop. Exch. Co., Inc. v. Meyer*, 117 Ohio St.3d 459, 884 N.E.2d 1056, 1061 (2008). "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* Moreover, "[t]he most basic requirement for the formation of a contract is a meeting of the minds[,] [which requires that] both parties ... have a clear understanding of the terms of the agreement and the intention to be bound thereby before an enforceable contract is created." *Kohler v. Taco Eds, Inc. (In re Taco Eds, Inc.)*, 41 B.R. 693, 695 (Bankr.N.D.Ohio 1984).

▮ Courts apply an objective analysis in determining whether or not there has been a meeting of the minds. *See 216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008) ("Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous."). Parties to a contract may establish a meeting of the minds through their testimony. *See, e.g., Giurbino v. Giurbino* 89 Ohio App.3d 646, 626 N.E.2d 1017, 1026 (Ohio App.) ("Based on the testimony ... we conclude that the requisite meeting of the minds was present to form a contract ...").

The Defendants presented extensive testimony regarding the meeting of their minds back in 1981 on the concept of a buy-sell agreement. Of course, this testimony could be viewed as self-serving. Corroborating their testimony, however, are the references to the 1981 Agreement in other pre-pledge documents, such as the April 1984 last will and testament of Mark Oakley and the letter dated February 3,

---

7. As discussed below, proof of the *contents* of a contract is subject to the so-called best evidence rule and its exceptions. "But the best evidence rule only limits evidence regarding a document's contents, not its existence. Fed.R.Evid. 1002, 1004. The Federal Rules of Evidence explicitly distinguish between questions regarding a document's contents and questions regarding its existence, reserving the latter for the fact-finder. Fed. R.Evid. 1008." *FM Industries, Inc. v. Citicorp Credit Servs., Inc.*, 2008 WL 717792 at *5 (N.D.Ill. Mar.17, 2008). Thus, the existence of the 1981 Agreement or other agreement prohibiting the pledge of the Pledged Stock is a disputed issue of fact that the Court may decide by considering all of the evidence.

1994 from Mark Oakley to his attorney, Robin Hoke. The will and the letter could be construed as evidence only that Mark Oakley believed that there was a 1981 Agreement and not necessarily that their was a meeting of the minds. But also corroborating the testimony are the legends on the Drydock stock certificates. Taken together, the evidence appears to support the existence of some kind of agreement restricting the transfer of some of the stock in Drydock in some manner.

### B. Contents of the 1981 Agreement

Proving the mere existence of some agreement restricting the transfer of shares in some manner does not win the day for the Defendants. For example, the 1981 Agreement might exist but prohibit only a sale of the shares, not a pledge, or prohibit only the sons, not their father, from transferring shares. *See United States v. Parker*, 376 F.2d 402, 408–09 (5th Cir.1967) (noting that, in a corporation in which there was only one class of stock, the only stock subject to transfer restriction under a buy-sell agreement was the stock held by the minority shareholders); *In re Mushroom Transp. Co.*, 90 B.R. 718, 728 (Bankr.E.D.Pa.1988) (noting that shares of "minor shareholders" were subject to a transfer restriction to which shares of "major shareholders" were not). To prevail, the Defendants must prove that the terms of their agreement prohibited the Debtor from pledging the Pledged Stock to Citizens and now gives the sons the right to purchase the shares.

### 1. The Best Evidence Rule

▉ Although a writing was not required to make the 1981 Agreement enforceable among the Defendants, they grounded their arguments on the existence of a written contract. In order to prove the contents of a written contract, "[t]he 'best evidence' rule ordinarily requires the proponent of documentary evidence to produce the original of such evidence for the court: 'To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required[.]' Fed.R.Evid. 1002." *Sicherman v. Diamoncut, Inc. (In re Sol Bergman Estate Jewelers, Inc.)*, 225 B.R. 896, 902 (6th Cir. BAP 1998), *aff'd*, 2000 WL 263338 (6th Cir. Feb.29, 2000). The best evidence rule protects against "dangers of fraud" and "faulty memory[.]" *Kodadek v. MTV Networks, Inc.*, 1996 WL 807435 at *3 (C.D.Cal. Dec.9, 1996), *aff'd*, 152 F.3d 1209 (9th Cir.1998).

### 2. An Exception to the Rule

In support of their argument that they should be able to introduce secondary evidence of the 1981 Agreement's contents, the Defendants rely upon an exception to the best evidence rule—Federal Rule of Evidence 1004, entitled "Admissibility of Other Evidence of Contents." In pertinent part, the rule provides as follows: "The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [all] originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]" Fed.R.Evid. 1004(1).

### 3. Loss or Destruction

▉ For secondary evidence to be admissible under Rule 1004, the proponent of the evidence must first establish loss or destruction of the original contract. *See Sol Bergman*, 225 B.R. at 902 ("To establish the admissibility of evidence pursuant to Rule 1004(1), the court must determine whether the original evidence was lost or destroyed . . ."). In order to establish loss or destruction the proponent must, at a minimum, prove that he or she conducted

a good faith, reasonably diligent search for the written contract and that the search did not uncover the contract. *See DeMarco v. Ohio Decorative Prods., Inc.,* 1994 WL 59009 at *9 (6th Cir. Feb 25, 1994) ("Although we agree with defendants that [the lawsuit] rests ultimately on the contents of the 1965 written contract and, therefore, that the best evidence rule does apply here, we conclude that this action fits squarely within the exception provided for by Rule 1004(1) ... Here, we are persuaded that [the proponent] conducted, in good faith, a reasonably diligent search for the original copies of the 1965 written contract. That his search turned out to be futile, in our estimation, provides sufficient proof that all copies were either lost or destroyed.") (citations omitted). *See also* 2 *McCormick on Evidence* § 237 (6th ed. 2006) ("Loss or destruction may sometimes be provable by direct evidence, such as testimony from a witness who destroyed the document. But more often the only available evidence will be circumstantial, usually taking the form of testimony that an appropriate search for the document has been made without locating it."). Determining whether the search was sufficiently thorough is within the sound discretion of the Court. *See Wright v. Farmers Co-Op of Arkansas and Oklahoma,* 681 F.2d 549, 553 (8th Cir.1982) ("[R]esolution of loss or destruction issues is a matter necessarily consigned to the sound discretion of the trial judge.").

The Defendants presented evidence that they conducted a thorough search for the 1981 Agreement. The Court concludes that the Defendants have established that, if the 1981 Agreement ever existed in written form, it has been lost or destroyed.

### 4. Bad Faith

▮▮▮ Even if the proponent proves loss, the opposing party may defeat the admission of secondary evidence by showing that the loss resulted from the proponent's bad faith. "To establish the admissibility of evidence pursuant to Rule 1004(1), the court must determine ... whether the proponent of the secondary evidence has acted in bad faith." *Sol Bergman Estate,* 225 B.R. at 902. "The mere negligent destruction of original evidence is insufficient to establish bad faith on the part of the proponent." *Id.* "[T]he party against whom the secondary evidence is being offered bears the burden of challenging its admissibility" for bad faith. *Id.* at 902–03 (internal quotation marks omitted). If the Defendants had lost or destroyed the 1981 Agreement in bad faith, then it would follow that they are now lying or committing a fraud upon the Court. But here the Plaintiffs expressly state that they are not alleging that "the Defendants are lying or are committing a fraud upon this Court." Post-trial Memorandum of Plaintiffs, Citizens Bank of Logan and Elizabeth H. Doucet, Trustee (Doc. 131) at 5–6. Accordingly, it appears that the Plaintiffs are not alleging bad faith on the part of the proponents. The Defendants, therefore, were entitled to introduce secondary evidence of the 1981 Agreement's existence and terms.

### 5. Type of Admissible Evidence

▮▮▮ Courts place no limitations on what kind of secondary evidence the proponent may use to prove the contract's existence and terms. *See Sol Bergman,* 2000 WL 263338 at *4 ("[C]ourts have held that secondary evidence, presented pursuant to Fed.R.Evid. 1004, can be in *any* form."); *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan Inc.),* 186 B.R. 35, 47 (Bankr.S.D.N.Y. 1995) ("Rule 1004 recognizes no degrees of secondary evidence."). Of course, the opponent "may attack the sufficiency of the secondary evidence including the credibili-

ty of the witness." *Sol Bergman,* 225 B.R. at 902. "This attack, however, goes not to the admissibility but to the weight of the evidence and is a matter for the trier of fact to decide." *Id.* (internal quotation marks omitted). *See also* Fed.R.Evid. 1008 ("[W]hen an issue is raised ... whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact."). The secondary evidence, however, must give the court or other finder of fact more to go on than "sheer speculation." *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1021 (6th Cir.1995) ("[W]e cannot state that a party can never prove the terms of [an insurance] policy without a copy of the policy or a reasonable facsimile thereof. But the party trying to do so certainly faces a formidable burden. Here no jury could find, absent sheer speculation, the scope of coverage, the relevant notice requirements, and all of the other aspects of the policy, on which coverage often hinges.").

### 6. Application to this Adversary Proceeding

▮▮▮▮▮ Passing the hurdles of loss or destruction and bad faith permits the proponent to introduce secondary evidence. Admissibility, however, is not the same as proof, and the proponent must also prove the material terms of the lost contract. *See Lincoln Elec.* 210 F.3d at 688 (proponent of secondary evidence had burden of proving existence and terms of lost con-

tract). *See also Keating v. Keating,* 2003 WL 23213143 at * 12 (Mass.Super.Oct.3, 2003) ("Although the parties may have agreed to the concept of a stock restriction or buy-sell agreement, the evidence was insufficient to prove that a binding agreement had been made with specific terms.... [T]he proof fails as to the precise terms of the agreement ...").

The Defendants demonstrated that the brothers probably agreed to the concept of a buy-sell agreement in some form. The Defendants, however, failed to carry their burden of proving the material terms of that agreement. The testimony showed that one of the Oakleys drafted a buy-sell agreement for a client and that the Oakleys were successful in locating a copy of that other agreement. Given this, they have not shown by a preponderance of the evidence that the marks on the form buy-sell agreement introduced into evidence from the Ohio Transaction Guide related to the 1981 Agreement. The Defendants also failed to prove that the Debtor—as opposed to his sons—was subject to whatever restrictions were set forth in the 1981 Agreement. Mark Oakley's will referenced an agreement among him, his brothers and Drydock, but did not mention the Debtor or the Trust as being parties to the agreement. Moreover, the Debtor did not act as though he believed that he or the Trust was subject to the 1981 Agreement. The Debtor not only pledged the Pledged Stock to Citizens, he signed an affidavit representing to Citizens that he had the authority to do so.[8] In addition, the docu-

---

**8.** At trial, the Debtor testified that, if the signature on the affidavit was his, then the sentence in which he purportedly represented that he had the authority to pledge the Pledged Stock could not have been in the affidavit at the time he signed it because he knew that the 1981 Agreement prohibited such a pledge. The Court does not find the Debtor's testimony regarding the affidavit to

be credible. Rather, the Court credits the testimony of J. Lee Canter and Paul Gerig. Mr. Canter testified that he attended the transaction by which the Debtor borrowed money from Citizens when Mr. Canter was still a Citizens loan officer, that he is and was at the time of the transaction an Ohio notary, that the Debtor signed the affidavit and that he, Mr. Canter, notarized. Mr. Gerig testified

ments governing the Trust, some of which the Debtor executed after the 1981 Agreement allegedly was created, were inconsistent with the Debtor's purported obligations under the 1981 Agreement and did not even reference the 1981 Agreement. Finally, even if the Court believed that the Debtor's or the Trust's stock was restricted under the 1981 Agreement, the Court cannot find that the purchase price for the Pledged Stock was $400 per share ($135,000 total) given Mark Oakley's statement in a letter to his attorney that there was a life insurance policy on the Debtor, "face amount $250,000, the stated purchase price for the trust shares." In short, the Defendants have failed to prove either of the material terms of the 1981 Agreement: price or restriction on the transfer of shares by the Debtor.

## C. The Pledged Stock Is Property of the Debtor's Bankruptcy Estate

 From the Trustee's perspective, this adversary proceeding might have been for naught had the Pledged Stock not become property of the Debtor's estate. The Court concludes that the Pledged Stock is property of the Debtor's bankruptcy estate, providing an alternative basis for the Court's decision.[9]

Subject to certain exceptions that do not apply here, property of a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Furthermore, § 541(c) places an insurmountable hurdle to removing the Pledged Stock from the estate. Section 541(c) provides:

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor ...

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

11 U.S.C. § 541(c).

Under § 541(c)(1), the Debtor's interest in the Pledged Stock became property of

---

that he is an attorney and that he handled the loan transaction for the title company. Mr. Gerig also testified that neither the Debtor nor anyone else made him aware of the 1981 Agreement and that he prepared the affidavit only because one of the Debtor's sons, Timothy Oakley, appeared to be the trustee of the Trust at that time and Citizens thus was concerned that the Debtor lacked authority to pledge the Pledged Stock.

9. Although the Plaintiffs did not assert this basis, "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law[.]" *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). Furthermore, the Court does not interpret the Stipulations to eliminate this argument from consideration. And even if the Stipulations purported to do so, they would not be binding upon the Court. *See Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir.2002) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, are not bound to accept as controlling, stipulations as to questions of law." (internal quotations marks omitted)); *Koch v. United States Dept. of Interior*, 47 F.3d 1015, 1018 (10th Cir. 1995) ("While th[e] court will honor stipulations regarding factual issues, [i]t is well-settled that a court is not bound by stipulations of the parties as to questions of law[.]" (citation and internal quotation marks omitted)).

his estate notwithstanding any restriction set forth in agreements such as the purported 1981 Agreement. Section 541(c)(2) might have supplied an exception to this result, but it would apply only if the Pledged Stock were an interest in a beneficial interest in a trust subject to a transfer restriction enforceable under applicable law. *See Taunt v. Gen. Ret. Sys. of Detroit (In re Wilcox)*, 233 F.3d 899, 904 (6th Cir.2000). The Pledged Stock once was held in the Trust, but the Debtor revoked the Trust prior to commencing his bankruptcy case. Moreover, there is no evidence that the Trust documents restricted the Debtor's rights to transfer his interest in the Trust. Accordingly, the Pledged Stock is property of the Debtor's bankruptcy estate. Although a sale of the Pledged Stock by the Trustee would have been subject to the sons' right to purchase the stock if the Defendants had met their burden of proof, *see In re Baquet*, 61 B.R. 495, 500 (Bankr.D.Mont.1986), the Defendants did not carry their burden here.

## V. Conclusion

The Defendants demonstrated the existence of some contract regarding the Pledged Stock. They have shown that there was probably a meeting of the minds among the Debtor's sons that they—the brothers—could not transfer their shares in Drydock. The Defendants, however, have failed to carry their burden of proving by a preponderance of the evidence that the terms of that contract prohibited the Debtor from pledging the Pledged Stock to Citizens. Nor have the Defendants carried their burden of proving that the contract now gives them the right to purchase the Pledged Stock for $400 per share. Furthermore, the Court concludes that the Pledged Stock is property of the Debtor's bankruptcy estate.

For the foregoing reasons, the Court finds that the Plaintiffs are entitled to a declaratory judgment on Count I and Count II of their complaint and that the Defendants are not entitled to a judgment. The Court will enter a separate judgment in accordance with this Memorandum Opinion.

**IT IS SO ORDERED.**